NO. 03-11194

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

BRUCE CARNIEL WEBSTER,

Petitioner-Appellant,

v.

UNITED STATES OF AMERICA,

Respondent-Appellee

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

BRIEF FOR BRUCE CARNIEL WEBSTER

Respectfully Submitted by:

**GARY TAYLOR**
Attorney at Law
State Bar No. 19691650
P. O. Box 90212
Austin, Texas 78709
512.301.5100
512.233.2953 (facsimile)

**PHILIP WISCHKAEMPER**
Attorney at Law
State Bar No. 21802750
Snuggs & Wischkaemper
901 Texas Ave
Lubbock, Texas 79401
806.763.9900
806.763.9904 (facsimile)

**LENA ROBERTS**
Attorney at Law
State Bar No. 24041793
Boerner & Dennis
P.O. Box 1738
Lubbock, Texas 79408
806.763.0044
806.763.2084 (Facsimile)

## RECOMMENDATION ON ORAL ARGUMENT

Petitioner believes that oral argument in this case will benefit the panel in resolution of the issues presented. Petitioner respectfully requests oral argument in this cause. *See*, Fed R. App. P. 34(a)(3).

## CERTIFICATE OF INTERESTED PERSONS

1.  **Bruce Carneil Webster**, United States Penitentiary, P.O. Box 33, Terre Haute, Indiana 47808.

2.  **Honorable Terry Means**, United States District Judge, 501 West 10th Street, Room 201, Ft. Worth Texas, 76102.

3.  **Allan K Butcher**, Trial and Appellate Attorney, 401 W. Belknap St., Magistrate Court, Fort Worth, Texas 76102-3105.

4.  **Larry M. Moore**, Trial and Appellate Attorney, 1112-A East First Street, Fort Worth, Texas 76102.

5.  **Allan K Butcher, Jr**, Appellate Attorney, P.O. Box 1642, Stephenville, Texas 76401-7642.

6.  United States Attorneys, **Christopher Curtis, Paul Macaluso, Richard Roper, Delonia Watson**, 1700 Burnett Plaza, 801 Cherry Street, Fort Worth, Texas 76102.

7.   **Gary Taylor,** Habeas Corpus Attorney, P. O. Box 90212, Austin, Texas 78709.

8.   **Philip Wischkaemper,** Habeas Corpus Attorney, 901 Texas Ave, Lubbock, Texas 79401.

9.   **Lena Roberts,** Habeas Corpus Appeal, P.O. Box 1738, Lubbock, Texas 79408.

# TABLE OF CONTENTS

RECOMMENDATION ON ORAL ARGUMENT ........................ -ii-

CERTIFICATE OF INTERESTED PERSONS ......................... -ii-

TABLE OF CONTENTS ....................................... -iv-

TABLE OF AUTHORITIES .................................... -vi-
    Supreme Court ....................................... -vi-
    Other Federal Jurisprudence .......................... -vi-
    State Cases ........................................ -viii-
    Other Authority .................................... -ix-

JURISDICTION ........................................... -1-

STATEMENT OF THE ISSUES ............................... -1-

STATEMENT OF THE CASE ................................. -2-
    A. Course of Proceedings and **Disposition in the Court Below** ....... -2-
    B. Statement of Facts ................................ -3-

SUMMARY OF THE ARGUMENT ............................. -13-

POINT OF ERROR ONE .................................... -13-
    THE EVIDENCE BEFORE THE TRIAL JUDGE WAS
    INSUFFICIENT TO SUPPORT A FINDING THAT PETITIONER IS
    NOT MENTALLY RETARDED. ........................ -13-

POINT OF ERROR TWO .................................... -26-
    PETITIONER'S MENTAL RETARDATION RENDERS HIM
    INELIGIBLE FOR EXECUTION ....................... -26-

CONCLUSION ............................................ -32-

CERTIFICATE OF SERVICE ................................. -33-

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -34-

# TABLE OF AUTHORITIES

SUPREME COURT

*Atkins v. Virginia*, 536 U.S. 304 (2002) . . . . . . . . . -14-, -15-, -26-, -27-, -29-, -30-

*Bell v. Cockrell*, 536 U.S. 954 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . -27-

*City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432 (1985) . . . . . . . -17-

*Hall v. Texas*, 537 U.S. 802 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-

*Jackson v. Virginia*, 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . -13-, -14-

*Lewis v. Jeffers*, 497 U.S. 764 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . -13-

*Modden v. Texas*, 536 U.S. 954 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . -27-

*Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*) . . . . . . . . . . . . . -15-, -17-, -18-

*Perkins v. Alabama*, 536 U.S. 953 (2002) . . . . . . . . . . . . . . . . . . . . . . . -27-

*Richmond v. Lewis*, 506 U.S. 40 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . -13-

*Tennard v. Cockrell*, 537 U.S. 802 (2002) . . . . . . . . . . . . . . . . . . . . . . . -27-

*Tennard v. Dretke*, ___ U.S. ___, 124 S.Ct. 2562 (2004) . . . . . . . . . . . . . . . -26-


OTHER FEDERAL JURISPRUDENCE

*Bailey v. Weber*, 295 F.3d 852 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . -27-

*Bell v. Cockrell*, 310 F.3d 330 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . -27-

*Blue v. Cockrell*, 298 F.3d 318 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . -29-

*Brownlee v. Haley*, 306 F.3d 1043 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . -27-

*Bryan v. Myullin*, 335 F.3d 1207 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . -27-

*Hearn v. Dretke*, 376 F.3d 447 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . -27-

*Hill v. Anderson*, 300 F.3d 679 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . -27-

*In re Campbell*, 2003 WL 22682129 (5th Cir. delivered November 13, 2003)
(unpublished) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

*In re Hicks*, 375 F.3d 1237 (11th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . -28-

*In re Holladay*, 331 F.3d 1169 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . -27-

*In re James Clark*, ___ F.3d ___ (5th Cir. No. 04-40451, delivered April 23, 2004)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-

*In re Johnson*, 334 F.3d 403 (5th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . -28-

*In re Ladd*, (5th Cir. No. 03-40534, delivered April 23, 2003) . . . . . . . . . . . . -27-

*In re Moore*, (5th Cir. No. 03-40207, delivered May 12, 2003) . . . . . . . . . . . . -27-

*In re Rivera*, (5th Cir. No. 03-41065, delivered August 6, 2003) . . . . . . . . . . . -28-

*Martinez v. Johnson*, 255 F.3d 229 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . -14-

*Moore v. Dretke*, 369 F.3d 844 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . -28-

*Riley v. Dretke*, ___ F.3d ___ (5th Cir. No. 02-41179, delivered March 5, 2004) -27-

*Santellan v. Cockrell*, 271 F.3d 190 (5th Cir. 2001) . . . . . . . . . . . . . . . . . . . . -13-

*Smith v. Bowersox*, 311 F.3d 915 (8th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . -27-

*United States v. Greenwood*, 974 F.2d 1449 (5th Cir. 1992) . . . . . . . . . . . . . . -13-

*Villareal v. Cockrell*, 73 F.App 742 (5th Cir. 2003) (unpublished) . . . . . . . . . . -27-

*Walton v. Johnson*, 269 F.Supp.2d 692 (W.D. Va. 2003) . . . . . . . . . . . . . . . -28-

*Woods v. Cockrell*, 307 F.3d 353 (5th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . -14-


STATE CASES

*Atkins v. Commonwealth*, 581 S.E.2d 514 (Va. 2003) . . . . . . . . . . . . . . . . . -29-

*Berry v. State*, 2004 W.L. 1470968 (Miss. Delivered July 1, 2004) . . . . . . . . . -28-

*Burns v. Warden*, 597 S.E. 195 (Va. 2004) . . . . . . . . . . . . . . . . . . . . . . -29-

*Emmett v. Commonwealth*, 569 S.E.2d 39 (Va 2002) . . . . . . . . . . . . . . . . . . -28-

*Ex parte Briseno*, 135 S.W.3d 1 (Tex.Crim.App. 2004) . . . . . . . . . . . . . . . . . -29-

*Head v. Hill*, 587 S.E.2d 613 (Ga. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . -28-

*Jenkins v. State*, 2004 W.L. 363352 (Ala. Crim. App. Delivered February 27, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

*Johns v. State*, No. CV501-0389CC (Mo. Cir. Ct, delivered July 17, 2003) . . -29-

*Johnson v. State*, 102 S.W.3d 535 (Mo. 2003) . . . . . . . . . . . . . . . . . . . . . . -28-

*Lambert v. State*, 71 P.3d 30 (Okla. Crim. App. 2003) . . . . . . . . . . . . . . . . . -29-

*Minor v. State*, 2004 W.L. 1909380 (Ala. Crim. App. Delivered August 27, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

*Morrow v. State*, 2004 W.L. 1909275 (Ala. Crim. App. Delivered August 27, 2004)

*Murphy v. State*, 54 P.3d 556 (Okla. Crim. App. 2002) . . . . . . . . . . . . . . . . -28-

*People v. Smith*, 753 N.Y.2d 809 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

*People v. Vasquez*, 84 P.3d 1019 (Colo. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . -28-

*People v. Washington*, 98 CR 2459 (Colo. Dist. Ct. Delivered April 28, 2003)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

*Pickens v. State*, 74 P.3d 601 (Okla. Crim. App. 2003) . . . . . . . . . . . . . . . . . -29-

*Snow v. State*, 875 So.2d 188 (Miss. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

*State v. Carter*, 913 N.E.2d 78 (Ohio App. 2004) . . . . . . . . . . . . . . . . . . . . . . -27-

*State v. Flores*, 93 P.3d 1264 (N.M. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

*State v. Williams*, 831 So.2d 835 (La. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . -28-


OTHER AUTHORITY

18 U.S.C. 3596 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-, -32-

28 U.S.C. Sec. 1294(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

28 U.S.C. Sec. 2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

28 U.S.C. Sec. 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1--4-, -10-, -13-

AMERICAN ASSOCIATION ON MENTAL RETARDATION, MENTAL RETARDATION:
DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992) . . -15-

American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF
MENTAL DISORDERS 41 (4TH ed., text rev. 2000) . . . . . . . . . . . . . . . . . . . . . . . -16-

ARIZ. REV. STAT. § 13-703.02 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

ARK. CODE ANN. § 5-4-618 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

CAL. PENAL CODE § 1376 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

COLO REV. STAT. § 18-1.3-1104 (2002) . . . . . . . . . . . . . . . . . . . . . . -29-

COLO. REV. STAT. § 18-1.3-1101 (2002) . . . . . . . . . . . . . . . . . . . . . . -29-

CONN. GEN STAT. § 1-1g (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

CONN. GEN STAT. § 53A-46(h) (2003) . . . . . . . . . . . . . . . . . . . . . . . -29-

DEL. CODE ANN. Tit. 11 § 4209 (d)(3)(a) (2003) . . . . . . . . . . . . . . . . . . -29-

DEL. CODE ANN. Tit. 11 § 4209(d)(3)(d) (2003) . . . . . . . . . . . . . . . . . . . -29-

Fed R. App. P. 34(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -ii-

FLA. STAT. Ch. § 921.137 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

KY. REV. STAT. ANN. § 532.135 (Michie 2002) . . . . . . . . . . . . . . . . . . . -29-

MD. CODE ANN., Criminal Law §2-202 (2003) . . . . . . . . . . . . . . . . . . -30-

N.Y. CRIMINAL LAW § 400.27(1) (2003) . . . . . . . . . . . . . . . . . . . . . . . -29-

NEV. REV. STAT. 174.098 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

TENN. CODE ANN. § 39-13-203 (2003) . . . . . . . . . . . . . . . . . . . . . . . -30-

U. S. CONST. AMEND VIII . . . . . . . . . . . . . . . . . . . . . . . . . -26-, -32-

WASH. REV. CODE § 10.95.030 (2003) . . . . . . . . . . . . . . . . . . . . . . . -30-

## NO. 03-11194

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE FIFTH CIRCUIT

### BRUCE CARNIEL WEBSTER,

**Petitioner-Appellant,**

**v.**

### UNITED STATES OF AMERICA,

**Respondent-Appellee**

### ON APPEAL FROM THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

### BRIEF FOR BRUCE CARNIEL WEBSTER

### JURISDICTION

This is an appeal from a final judgment of the United States District Court in a criminal case. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. Sec. 2253, 28 U.S.C. Sec. 2255 and 28 U.S.C. Sec. 1294(1).

### STATEMENT OF THE ISSUES

The United States District Court for the Northern District of Texas - Fort Worth Division, has granted Petitioner a Certificate of Appealability on the following issues:

1.    The evidence presented at trial was insufficient to support the trial judge's determination that Petitioner is not mentally retarded.

2.    That Petitioner is ineligible for execution because he is mentally retarded.

## STATEMENT OF THE CASE

### A. Course of Proceedings and Disposition in the Court Below

Petitioner filed his 28 U.S.C. § 2255 Motion with the United States District Court for the Northern District of Texas, Fort Worth Division, on September 29, 2000. That Motion was amended August 16, 2002. The District Court entered an order denying Petitioner's § 2255 Motion on September 30, 2003. The District Court granted Petitioner's request to file a discovery motion on April 4, 2001. Petitioner filed his discovery motion which was denied on June 18, 2002. Petitioner filed a Rule 59(e) Motion to Alter or Amend the Judgment which was denied on October 29, 2003.

Petitioner filed a Notice of Appeal and Motion for Certificate of Appealability with the District Court on December 23, 2003. The District Court granted COA on two of seventeen points of error: (1) whether Petitioner is ineligible for the death penalty because he is mentally retarded; and, (2) whether the evidence at trial was insufficient to support the court's finding that Petitioner is not mentally retarded. Petitioner applied to this Court for a Certificate of Appealability on the fifteen points

of error denied by the District Court. On December 7, 2004, this Court denied

Petitioner's request for additional certificates of appealability. Therefore the brief

addresses only those issues on which the District Court granted a certificate of

appealability.

## B. Statement of Facts

In his first point of error Petitioner contends he is ineligible for execution

because he is mentally retarded (twelfth ground in his §2255 motion). In his second

point of error Petitioner contends the trial judge erred in holding he was not mentally

retarded (thirteenth ground in his §2255 motion). Petitioner further contended his rights

to Due Process were violated by the trial judge's usurpation of the jury's determination

of mental retardation. Petitioner re-urges and incorporates those factual allegations as

well as the entirety of the record at trial.

The trial judge submitted punishment issues to the jury to allow them to

determine whether Petitioner "is or may be mentally retarded," and whether Petitioner

"has low intellectual functioning."[1] Four jurors answered these punishment issues in

---

[1]    Trial counsel objected to the wording of this punishment issue:

> MR. MOORE:  Judge, we would object, first, to
> the manner in which the Court is submitting the
>
> (continued...)

the affirmative. After the verdict was rendered by the jury, the trial judge, *sua sponte*, without notice to the parties, and contrary to those juror's findings, held Petitioner was not mentally retarded.

Petitioner's § 2255 motion specifically set forth the evidence of relating to mental retardation at trial. See, § 2255 motion, pg 6. This summary includes:

- Petitioner was so mentally limited that a co-defendant, Marvin Holloway had to make the flight arrangements and buy Petitioner's ticket.

- The government brought several school teachers and administrators who testified that Petitioner was not retarded. Some of these had only limited contact with Petitioner (R.24:240) and others had experience with him in "basic" classes (i.e., basic classes are not special education, but it is the lowest level of course work [R.25:47, 49]).

- Petitioner, his mother and the other children suffered significant physical abuse by the father. (R.23:6,7, 14, 27, 105). The father routinely beat the children with a hose, fan belt, fireplace poker, or anything else he could reach. Sometimes he forced a child to strip naked and had the other children hold the naked child as the father beat him/her. (R.23:7-11, 37, 55, 60).
- Petitioner was often beaten by the father. (R.23:47) A sister testified that she saw the father tie Petitioner's hands and feet and beat him. Usual punishment

---

[1](...continued)

> nonstatutory mitigating factor Number 1, where it reads, the defendant is or may be mentally retarded, and we object to that portion of the mitigating factor -- submission of the mitigating factor that includes the language "or may be." We think that the submission should read that the defendant is mentally retarded . . .

was said to be 25 licks on the feet and back, doubled if the child moved. (R.23:107, 143).

- Petitioner's father could not read or write and did not work after being hit in the head in an industrial accident in 1969. (R.23:54, 134). Petitioner's mother dropped out of school in the 7th grade. (R.23: 21, 135).

- The abuse by Petitioner's father included forced sex between the children or between a child and the mother, forcing children to "kiss the cat's behind," placing a clothespin on a child's penis, forcing a child to eat black pepper, "slop," human waste, "piss in bread," and other heinous acts such as dropping the children on concrete, burning or branding them with a hot iron, shocking a child with the spark plug wire from a lawnmower, and placing a concoction of hot sauce, pepper and alcohol on a child's anus. (R.23:13, 17,21,39, 55, 57-59, 112,113, 123, 126; 24:176, 177).

- State authorities investigated Petitioner's home and twice removed one of the boys. (R.23:141; 24:177).

- All of the male children were in special education classes and several were labeled "mentally retarded." (R.23:19, 20). Petitioner's brother, Tony, received government assistance due to his "slowness." (R.23:36). Petitioner's sister, Future, was in extended treatment for mental illness. Two of Future's children were treated for mental illness. (R.23:71) Petitioner's sister, Dorothy, received mental health treatment, (R.23-118, 119), as did Petitioner's mother, and his siblings Tony and Dassie. (R.23:136, 149).

- Petitioner went to prison on a probation revocation and was assigned to a hoe squad. He attended school in prison, but after four years he still had not qualified for his GED and the "good time" credit that went with it. (R.22:98, 102).

- Petitioner never had a bank account, credit card or his own apartment. He always lived with someone who did everything for him. (R.23:154). For example, his mother bought him a car and his girlfriend paid the insurance on it.

- Petitioner subsisted on money from his mother, sisters and brothers as well as welfare and food stamps. (R.22:47, 64, 65; 23:133, 145, 150).

- Petitioner was evaluated in 1992 by the Southeast Arkansas Mental Health Clinic in Pine Bluff. His Wechsler Adult Intelligence Scale (WAIS) showed a score of 48, well within the retarded range. (R.23:177, 178). The Arkansas report also noted the appellant suffered from intense anxiety and paranoia. (R.177, 178).

- Dr. Raymond Finn tested Petitioner and obtained WAIS scores of 59 verbal, 60 performance and 59 overall. (R.23:187). Dr. Finn's scores place Petitioner in the third percentile and Dr. Finn concluded that Petitioner was retarded. (R.23:189). Finn said these tests were consistent with the earlier Arkansas testing.

- Immediately before trial Dr. Finn administered another test and expected Petitioner to be "better" because of the "practice effect." While Petitioner's score improved, receiving scores of 72 for verbal, 59 for performance and 65 combined, Petitioner's scores remained well within the mental retardation range. (R.23:192, 193). These scores, coupled with Petitioner's adaptive skills, indicated mental retardation. (R.23:193). Dr. Finn noted Petitioner's word knowledge was one of his stronger points, but he cannot draw inferences, make general statements or conclusions. Petitioner could absorb only the rudiments of school and could communicate only at a basic level. (R.23:193, 194).

- Dr. Keyes is a recognized specialist in mental retardation. He administered a Stanford-Benet Intelligence test on which Petitioner scored in the lowest .2 percent of the population with a composite score of 51. (R.24:20). If one lined 1,000 people up in accordance with their intelligence, Petitioner would be the second from the last. (R.24:26).

- Dr. Keyes' examination was consistent with Petitioner's 1992 Arkansas tests and Dr. Finn's testing. Dr. Keyes' testing reveals "soft signs" of neurological or brain damage that warranted testing. (R.24:18, 19).

- Dr. Keyes wrote his dissertation on malingering and was initially suspicious of Petitioner's low scores. He functioned verbally at a higher level than his IQ scores would indicate. (R.24:46, 47). Other testing revealed unexpected reading and writing skills which made Keyes give yet another intelligence test (the Kaufman). The results were very similar to the Stanford-Benet --a composite

score that put Petitioner below the first percentile. The consistency of the scores was enough for Dr. Keyes to conclude that any question of malingering was "out the window." (R.24:31).

- Dr. Keyes conducted a Vineland Social Maturity and Adaptive Behavior Scale to examine Petitioner's ability to function in the every day world. Because mental retardation has an onset prior to age 18, Keyes had to interview people who had significant, ongoing contact with Petitioner before he turned eighteen. (R.24:38, 39).

- Based on all of his findings, Dr. Keyes concluded that Petitioner functioned at the level of a six or seven year old child. (R.24:43, 44).

- Dr. Keyes concluded that Petitioner was mentally retarded and functioned at a level significantly lower than the vast majority of the population. Petitioner was unable to see the consequences of his actions, unable to plan situations appropriately, unable to think in abstract methods and ways, unable to communicate under certain circumstances, and had a poor short term memory. Petitioner had difficulty concentrating on a task, was very distractable, and could not learn from his mistakes in many situations. (R.24:47, 48).

- Dr. Keyes concluded Petitioner suffered from both organic (brain damage) and non-organic (environmental) mental retardation. (R.24:95).

- Dr. Fulbright is a neuropsychologist who gave various tests to Petitioner for memory, reasoning, problem solving, academic ability, sensory and motor functioning, thought process and auditory and visual skills. (R.24:129). He reviewed the materials from the other defense experts. On the Pace Auditory Serial Test, Petitioner did not function at a level at which he could even take the test. He could not add single digits in order. (R.24:131). Overall, Dr. Fulbright's findings were consistent with those of Drs. Finn and Keyes and were what one would expect in a mentally retarded person. (R.24:131, 132).

- Dr. Fulbright found that Petitioner was severely impaired in his ability to think abstractly or to plan and carry out a plan of action. (R.24:134). On one test that normally required 50 seconds for a person his age, Petitioner, with coaching, took 266 seconds. (R.24:135).

- Dr. Fulbright found that on tests of reasoning abilities, logical analysis, and abstract reasoning, Petitioner had "significant intellectual limitations." (R.24:136).

- Dr. Fulbright concluded that Petitioner is "not able to think in an abstract manner, not able to consider different alternatives from one point to the next and, basically, has just severe impairment in his ability to think through, reason and plan, and kind of critically judge situations." (R.24:137).

- Of particular importance were tests given by Dr. Fulbright that indicated the possibility of right hemisphere impairment in the brain. (R.24:141, 142).

- On core communication skills, Petitioner scored in the second percentile. (R.24:139). On tests for auditory processing and visual skills, Petitioner scored in the seventh percentile, which is considered to be the borderline range. (R.24:141, 142).

- Dr. Fulbright concluded that his test results were consistent with either a non-mentally retarded person with severe brain injury, or an across the board problem in brain functioning. (R.24:144).

- Dr. Fulbright testified that these results could not have been faked--they indicate either mental retardation or organic brain injury. (R.24:144, 145). On intellectual ability, Dr. Fulbright placed Petitioner in the first percentile or lower. His memory was low average or impaired. His reasoning abilities were severely impaired--lower than the first percentile. (R.24:147,148).

- Dr. Cunningham interviewed Petitioner, numerous family members, and reviewed voluminous records in the case. As a result Dr Cunningham concluded that Petitioner had psychological disorders, including auditory and visual hallucinations.

- Dr. Cunningham concluded Petitioner was retarded and had antisocial, narcissistic, and dependent personality disorders. (R.24:188, 189).

- Dr. Cunningham noted an association between Petitioner's antisocial personality disorder and the chronic abuse and childhood trauma that he had suffered. (R.24:190).

- Dr. Cunningham believed Petitioner's history of brutal abuse took away his dignity, self control, self direction, and self esteem. (R.24:192). While a normal family operated to protect a child from the world, Petitioner's was the opposite. The family traumatized and damaged Petitioner with physical violence and sadistic and perverse discipline, incestuous accusations, corruptive sexual abuse, deadly threats to family members, violent abuse of his mother, impossible rules, and psychological and emotional stress. (R.24:193).

- Petitioner did not suffer from a mental disease that would render him insane --he knew right from wrong. His situation was far more complex due to his morals and other issues associated with retardation. (R.24:210).

- Dr. Denkowski, unlike either of the government experts, was certified to render diagnostic opinions on mentally retarded people for the Texas Department of Mental Health and Mental Retardation. He testified that all eleven parts of the WAIS had to be given if the test was to be used for diagnostic purposes, and even if it is to be used for non-diagnostic reasons, one still had to administer a minimum of nine subtests. The government's expert, Dr. Parker, gave only seven – or 65% – of the complete test. (R.26:201-204). Dr. Denkowski testified that there was no authority for administering less than the full test or for excluding difficult subtests while including only the easier subtests, as Dr. Parker did. (R.26:204-206). Consequently, Dr. Parker's results were substantially inflated. Id.

- Dr. Parker said that an IQ score in the 50s, as found by Dr. Finn, would "raise the possibility" of adaptive functioning problems, but, he said, the correlation was not perfect. (R.26:109). Parker also administered a competency exam, although competency was never an issue. He also gave Petitioner an MMPI, even though the test manual states that an eighth grade reading level is required. (R.26:87, 90). Dr. Parker's results on the "S" scale indicated that Petitioner did not understand the test questions even though Dr. Parker read the questions to him. (R.26:91).

During the §2255 proceedings, Petitioner presented additional evidence which demonstrates he is mentally retarded and which questioned the government's evidence on mental retardation. Petitioner demonstrated evidence of racial bias in the Watson Chapel school system and the potential bias of the government's witnesses concerning Petitioner's mental retardation. A school counselor from the School District would have testified that the government's portrayal of Petitioner as a "leader" among his peers is misplaced. Petitioner was a leader only when in the company of younger children; i.e., in situations where he was physically bigger, but equal in mental abilities. Whenever Petitioner was in the company of older children and children more advanced in their mental abilities, he was always a "follower."

Loula Gray, an elementary school teacher with the Watson Chapel School District for thirty-six years and one of Petitioner's former teachers, testified that Petitioner was "socially promoted" throughout elementary school - that he was promoted to the next grade each year even though he had not mastered the skills and knowledge in his current grade. Ms. Gray would also have further testified that Petitioner should have received special education services.[2] Ms. Gray testified that

---

[2]      There is a stigma which attaches to special education students and, according to E.C. Turner, a counselor in the school district, it is common for students to "mask" or "fake" success in order to avoid such a label and the stigma attached. Moreover, some families refused to put their children in special

(continued...)

Petitioner was assigned to "basic" English and Math classes. Such a placement evolves from low academic performance and difficulties with reading and comprehension. In such classes the teachers endeavor to cover much the same materials as in regular classes but at a much slower rate. Such basic classes focus on "skill areas" or "basic skills."

Ms. Gray would have described Watson Chapel School District as a "truly . . . racist district." The District was "hell on black boys" during the time Petitioner attended school– minority students received disparate treatment.[3] Showing the existence of racial discrimination in Petitioner's school district is important to the determination of mental retardation because, once any student is classified in "special education" the School District's ability to expel or remove the student is limited. Petitioner's former teacher, Loula Gray, thought Petitioner should have and would have been in special education but for the discriminatory practices of the School District.

---

[2](...continued)
  educational classes in order to help the children "fit in."

[3]    Ms. Gray can describe an incident when Principal Stewart's son (Stewart testified for the Government) carried a weapon on to the Watson Chapel High School campus. Though a black student who committed a similar infraction was expelled, Stewart's son was transferred to another school and received no disciplinary action. Gray stated that this incident was addressed at a school board meeting, but Petitioner's attempts to obtain a copy of such school board records were denied by the Watson Chapel School District.

BRUCE CARNEIL WEBSTER
BRIEF ON THE MERITS                          -11-

Evidence of racial discrimination in Petitioner's school district is abundant. Phyllis Rankin, an elementary school principal in the Watson Chapel School District, was investigated for kicking a special education student. Ms. Rankin further hid one of the black students "free lunch" cards, forcing Gray to buy the child's lunch.

In 1970 the Watson Chapel School District came under the control of the Federal Courts through a desegregation order. The District Court found that the District operated a dual school system based upon race.[4] Thereafter the school board and superintendent failed to comply with the District Court's Order and, after a hearing, the District Court found several or all of the members guilty of civil contempt.[5]

Long before the instant offense, Petitioner was provided IQ testing at an Arkansas Mental Health Facility and his score reflected an IQ of 48, well within the range to be diagnosed as retarded. Investigator Joseph Ward, in interviews with siblings, determined that Webster attended special education classes while enrolled in Coleman Elementary School.

---

[4]     A copy of this order was attached to Petitioner's amended § 2255 Motion.

[5]     A true and correct copy of this February 6, 1971 Court Order is attached hereto. (*See* Attachment "C"of Petitioner's Amended § 2255 Motion).

## SUMMARY OF THE ARGUMENT

1.      In Point of Error Number One Petitioner contends that the evidence before the trial judge at the time in which he determined Petitioner was not mentally retarded was insufficient to support this finding.

2.      In Point of Error Number Two Petitioner contends that he is mentally retarded and that a review of all of the evidence before the District Court in the §2255 proceedings overwhelmingly supports such a finding.


## POINT OF ERROR ONE

### THE EVIDENCE BEFORE THE TRIAL JUDGE WAS INSUFFICIENT TO SUPPORT A FINDING THAT PETITIONER IS NOT MENTALLY RETARDED

The standard for sufficiency of the evidence in *habeas corpus* proceedings was announced in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See also, Lewis v. Jeffers*, 497 U.S. 764 (1990); *United States v. Greenwood*, 974 F.2d 1449 (5th Cir. 1992); *Richmond v. Lewis*, 506 U.S. 40 (1992); *Santellan v. Cockrell*, 271 F.3d 190 (5th Cir. 2001); *Martinez v. Johnson*, 255 F.3d 229 (5th Cir. 2001); *and, Woods v. Cockrell*, 307 F.3d 353 (5th Cir. 2002). In *Jackson*, the Supreme Court held a petitioner entitled to relief if it was found that upon the record evidence

adduced at trial, in a light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt in terms of the substantive elements of the criminal offense as defined by state law. The standard, therefore, is not a "no evidence" standard, but rather sufficiency thereof as defined in *Jackson*.

Here, of course, we are not dealing with issues of guilt or innocence. The statute gives no guidance on what burden of proof is used in our inquiry. However, the United States Supreme Court held, after Petitioner's trial, that the execution of persons who are mentally retarded is an "excessive" punishment, and that "the Constitution 'places a substantive restriction on . . . the power to take the life' of a mentally retarded offender." *Atkins v. Virginia*, 536 U.S. 304, 321 (2002). The Court based its conclusion on two grounds. First,

> the large number of States prohibiting the execution of mentally retarded persons (and the complete absence of States passing legislation reinstating the power to conduct such executions) provides powerful evidence that today our society views mentally retarded offenders as categorically less culpable than the average criminal.

And second,

> Because of their impairments, . . . by definition [mentally retarded offenders] have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to

understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that in group settings they are followers rather than leaders. Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability.

*Id.* at 315-318. *Atkins* specifically overruled *Penry v. Lynaugh*, 492 U.S. 302 (1989) (*Penry I*).

*Atkins* specifically noted the definitions of mental retardation as adopted by the American Association of Mental Retardation and in the Diagnostic and Statistical Manual of Mental Disorders. The American Association on Mental Retardation ("AAMR") defines mental retardation as: (1) sub-average general intellectual functioning (i.e., an IQ of approximately 70 or below) existing concurrently with (2) related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work; and (3) onset before the age of eighteen.[6] AMERICAN ASSOCIATION ON MENTAL

---

[6]     In late May 2002, the AAMR released the 10th edition of its manual, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS. Mental retardation is redefined in this manual, as follows:

> Mental retardation is a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18.

(continued...)

RETARDATION, MENTAL RETARDATION: DEFINITION, CLASSIFICATION, AND SYSTEMS OF SUPPORTS 5 (9th ed. 1992) [hereafter "AAMR"]. The Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") employs a definition that is nearly identical.[7] Each of the three elements is an essential component of a professional diagnosis of mental retardation. In the past the Supreme Court has expressly relied on the AAMR's three-prong definition of mental retardation, *Penry*, 492 U.S. at 307-09, n.1.

The first component of the clinical assessment of mental retardation is measuring the magnitude of the individual's intellectual impairment. To be classified as mentally retarded, an individual must be found to be functioning at the

---

[6](...continued)

> The three diagnostic criteria are the same, but there is now a greater emphasis on adaptive behavior deficits, and the way in which those deficits are described has changed. The Luckasson report, though prepared for the case *Ex parte Briseno*, is relevant to this case because of its discussion of impairments and deficits. The differences between the 1992 AAMR manual and the 2002 AAMR manual are addressed in Professor Luckasson's report.

[7]     The DSM-IV-TR defines mental retardation as follows:

> The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A), that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (4TH ed., text rev. 2000) ("DSM-IV-TR").

very lowest intellectual level encountered in the general population, as measured by a standardized intelligence test. The intellectual functioning of any individual with mental retardation will generally fall within the lowest three percent of the entire population.[8] Thus, the first prerequisite for a diagnosis of mental retardation is severely impaired cognitive functioning.

The second requirement, deficits in adaptive behavior, confirms the reality of the psychometric measurement of the individual's severe impairment. The intellectual impairment must be observed to have "real-world" effects on the individual's life functioning. As the Supreme Court has noted, all people with mental retardation "have a reduced ability to cope with and function in the everyday world." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 442 (1985). The requirement of real, identifiable disabling consequences in the individual's life – reduced ability to "cope with common life demands," DSM-IV-TR 42 – assures that the diagnosis applies only to persons with an actual, functional disability. *See,* AAMR, MENTAL RETARDATION 38. Previous versions of the definition of mental retardation expressed this requirement in terms of "deficits in adaptive behavior," *see Penry*, 492 U.S. at 308 n.1 (citing an earlier edition of the AAMR's

---

[8]    *See, e.g., Amici Curiae* Brief of American Psychological Association, American Psychiatric Association, and American Academy of Psychiatry and the Law in *McCarver v. North Carolina*, No. 00-8727, at 7 ("studies invariably put the number [of people with mental retardation] at less than 3% of the general population, usually in the 1% to 3% range"); DSM-IV-TR 46 ("The prevalence rate of Mental Retardation has been estimated at approximately 1%.").

classification manual), while more recent formulations employ the terms "related limitations" in "adaptive skill areas." AAMR, MENTAL RETARDATION 5; *see* DSM-IV-TR 42. Both terms reflect the same concept– that the impairment in intellectual ability must have an actual impact on everyday functioning.

The third requirement is that the disabling condition must manifest itself during the developmental period of life– before the individual reaches the age of eighteen. Requiring the disability to have occurred at birth or during childhood means that the individual's mental development during his or her crucial early years was affected by the impairment of the brain's ability to function. This element is derived from the understanding of modern neuroscience about the way the brain develops and the implications of its arrested development for cognitive impairment. *See*, AAMR, MENTAL RETARDATION 16-18. In practical terms, it means that any individual with mental retardation not only has a measurable and substantial disability now, but that he or she also had it during childhood–a condition which significantly reduces the ability to learn and gain an understanding of the world.

The testimony at Petitioner's trial utilized an almost identical definition of mental retardation with three main components: (1) A full scale IQ of 75 or below; (2) Deficits in adaptive behavior; and (3) An onset of the disability prior to age 18. Petitioner would respectfully show that the evidence at trial conclusively established all the elements of mental retardation.

Evidence at trial established that Petitioner had impaired significant cognitive functioning. Petitioner's full scale IQ scores ranged from 51 to 72.[9] The highest full scale IQ score attributed to Petitioner was a score of 72 (which itself is within the range of IQ scores which demonstrate a significant cognitive impairment). This score was obtained by one of the government's experts, Dr. George Parker. Dr. Parker performed a series of psychological tests but admitted he was not certified by the Texas Department of Mental Health and Mental Retardation to make a diagnosis of mental retardation. Dr. Parker administered the WAIS-R, but admitted that he only administrated seven of the eleven subtests and estimated the results of the remaining subtests. These four subtests are the same subtests in which Petitioner scored lowest on previous IQ tests. Even the government's other experts testified that such a practice is questionable and inappropriate. This practice tends to skew the test scores higher than those of the other experts who performed IQ testing. However, considering the margin of error with a WAIS-R, a full scale score of 72 does not distinguish this full scale score from that obtained by the other

---

[9]    Dr. Keyes administered the Stanford Binet test, Fourth Edition, to determine Petitioner's IQ. Petitioner scored in the lowest .2 percent of the population with a full scale score of 51. Dr. Keyes noted that the score of 51 was essentially the same scale number used in other intelligence tests to define mental retardation. Keyes later performed an additional IQ test--the Kaufman Adolescent and Adult Intelligence Test. There was "virtually no difference" between Petitioner's full scale IQ on either test. Finally, Dr. Keyes administered the Woodcock-Johnson Psycho-Educational Battery, Part 2 to test Petitioner's literacy. To Dr. Keyes' surprise, Petitioner performed well for a person with his IQ.

experts–all demonstrate a significant impairment in cognitive functioning. Petitioner would respectfully show that no rational juror could not find that Petitioner suffered significant impaired cognitive functioning.

Dr. Richard Coons, also an expert witness for the government, interviewed Petitioner in the Mansfield Correctional Facility and reviewed school records, co-defendant's statements, and various reports and tests of other doctors, (including Dr. Parker's). Reviewing adaptive functioning evidence outside the institutional setting is critical to an accurate assessment of mental retardation. Neither Dr. Coons nor Dr. Parker interviewed anyone who knew Petitioner outside the correctional setting, thereby limiting their ability to determine what adaptive deficits Petitioner has, because of the institutional structure and lack of freedom.

As noted in the factual summary above, there is substantial additional evidence of adaptive deficits in functioning. Dr. Keyes administered the Bender-Gestalt test, which he described as a visual motor integration test. The underlying purpose of this test was "to see how well a person can take a picture and copy it on to another picture, on to another page, organize the picture, and put it together as well as possible given the person's abilities." According to Dr. Keyes, "it is a very good indicator of soft signs of neurological damage." Petitioner scored slightly below average on this tests and exhibited several neurological "soft signs" indicating brain damage.

Dr. Keyes also performed an adaptive skills assessment on Petitioner. Keyes used the Vineland Adaptive Skills Assessment, which he described:

> I use the Vineland, which is a social maturity scale and adaptive behavior scale, whereby I sit down with people who know the individual and get as much information as I can from them. I like to find out about the person's background, their childhood, their infancy, their developmental history. I get as much history as I can on the individual. Then I also like to find out about the social skills of the individual, what kind of people they were as far as their work attitude, their work ethic, et cetera, et cetera. I get as much information as I can. And it's typically not, I'm asking you questions, you're giving me answers. It is a discussion that is held in interview format.

Through his various interviews with Petitioner and the various people who knew him well throughout his life, Dr. Keyes determined that Petitioner functioned somewhere in the range of a seven year-old. As a result of the exhaustive testing, evaluation and interviews with numerous persons, Petitioner was diagnosed as mentally retarded.

Dr. Robert Fulbright performed a battery of tests on Petitioner relating to brain impairment. As a result of his extensive testing, Fulbright determined that Petitioner had significant impairment in his attention capacity. Fulbright testified that Petitioner's "ability to pay attention to what he hears for short periods of time does not appear to be too bad. His ability to pay attention to more than one thing at a time and, at the same time on the flip side of the coin, filter out a distraction appears to be quite poor." Further, Petitioner had difficulty with complex

communications, and sentences had to broken down and simplified for him to understand.

Fulbright tested Petitioner's reasoning abilities and testified that "absolutely, [Petitioner] could not get it." Petitioner's psychomotor test results revealed that he was unusually unsystematic and unorganized. Sensory and motor skills testing indicated Petitioner had a possible frontal lobe impairment or dysfunction. The only areas in which Petitioner demonstrated anywhere in the average range was verbal fluency. Dr. Fulbright believed Petitioner suffered from organic brain damage.

Other evidence at trial established adaptive deficits. Petitioner was unable to make his own flight arrangements in the commission of this offense. Mental retardation and special education classes were common with Petitioner's siblings and parents. Petitioner himself never attended anything more than "basic" classes. Though he had incentives to complete his GED while in prison, after trying for four years Petitioner was unable to do so. Petitioner was unable to learn from experience and suffered continual beatings and abuse in his home. Moreover, Petitioner never had a bank account, credit card, or his own home. He always lived with someone who provided for him.

The Government's evidence relating to Petitioner's adaptive functioning was generally limited only to the time period he was incarcerated before trial. This

evidence included persons who observed Petitioner in jail and interviews with jail personnel. The government performed no social history on Petitioner, a step which is critical to determine whether adaptive deficits were present during the developmental period. Dr. Denis Keyes, a psychologist and nationally recognized expert on mental retardation, testified that it is necessary to interview persons who knew Petitioner throughout his entire life, in particular before the age of 18, in order to appropriately assess adaptive behavior deficiencies. The only other evidence from the Government concerning adaptive behavior deficits was the testimony from representatives from the Watson Chapel School District that Petitioner was not assigned to the special education program, and appeared to be a leader among his "peers."

All of the evidence presented at trial concerning Petitioner's adaptive behavior outside of his incarceration came through the testimony of Dr. Mark Cunningham, who interviewed Petitioner's family members over the phone, and Dr. Keyes who interviewed them in person.[10] Dr. Keyes traveled to Pine Bluff, Arkansas, and interviewed Petitioner's family, friends, school teachers, and other collateral witnesses who described Petitioner's adaptive behavior throughout his entire life and development period." Additionally, Dr. Keyes was the *only* expert witness who assessed Petitioner's adaptive behavior through a standardized

---

[10] Dr. Cunningham found the existence of adaptive deficits in functioning and diagnosed Petitioner with mental retardation.

psychological instrument–the Vineland Social Maturity and Adaptive Behavior Scale. Based upon this instrument, Petitioner had the requisite deficits in adaptive behavior necessary for a diagnosis of mental retardation.

The final component of mental retardation is the requirement that the disability manifest itself prior to age 18. While the experts will agree that an IQ score is relatively stable over time, the only manner in which adaptive behavior deficits can be evaluated is through interviewing individuals who knew and dealt with Petitioner during those developmental years. Once again, the government's experts did not address this issue, as they could not have, because they did no interviews or social history investigation outside the institutional setting of the jail. The only evidence before the District Court on the manifestation of Petitioner's disability in adaptive behavior came through the testimony of Drs. Keyes and Cunningham, who both agreed that Petitioner's disability manifested itself prior to the age of eighteen. The jury at Petitioner's trial returned the "Special Findings Form" in which four of the jurors found that Petitioner "is or may be mentally retarded." However, after trial and without a hearing, the District Judge entered a "Factual Finding Regarding Mental Retardation" disagreeing with these jurors and finding that Petitioner was not mentally retarded.

Petitioner would respectfully show that no rational trier of fact could find that he *was not* retarded. Four jurors specifically found that Petitioner "is or may be

mentally retarded." Moreover, a review of the extensive mental retardation evidence before the District Court, even viewed in a light most favorable to the government, reveals that the evidence was clearly insufficient to support the Court's finding that Webster was not mentally retarded.

## POINT OF ERROR TWO

## PETITIONER'S MENTAL RETARDATION RENDERS HIM INELIGIBLE FOR EXECUTION

18 U.S.C. 3596 ( c) states in pertinent part: "**Mental capacity.**-A sentence of death shall not be carried out upon a person who is mentally retarded." There is essentially no guidance on the application of the statutory provision. And, as is argued in point of error one supra, the United States Supreme Court has held that the execution of a mentally retarded person violates the Eighth Amendment and is cruel and unusual punishment in light of our current societal standards. *See, Atkins, supra.* But, while the Supreme Court at least referred to two accepted definitions for mental retardation, the Court provided no guidance on the implementation of their holding. The only recent statement from the Supreme Court occurred in *Tennard v. Dretke*, ___ U.S. ___, 124 S.Ct. 2562 (2004), where the Supreme Court emphasized that nothing in their *Atkins* opinion "suggested that a mentally retarded individual must establish a nexus between her mental capacity and her crime before the Eighth Amendment prohibition on executing her is triggered." Therefore, under the controlling authority, there is little direction concerning *who* makes the determination of mental retardation, *when* such a determination is made, *who* has the burden of proof, and *what* is the threshold of proof that must be made.[11]

---

[11]    The Supreme Court has granted certiorari and remanded a number of cases to the courts of appeals for consideration in light of *Atkins. See e.g., Hall v.*

(continued...)

Since the *Atkins* decision, various courts and legislatures have struggled to implement the prohibition against the execution of mentally retarded persons.[12] *See, Bell v. Cockrell*, 310 F.3d 330 (5th Cir. 2002); *and, Hill v. Anderson*, 300 F.3d 679 (6th Cir. 2002). Appellate courts have appointed counsel, or stayed an impending execution, for death sentenced individuals who have made an initial showing of mental retardation. *See e.g., Hearn v. Dretke*, 376 F.3d 447 (5th Cir. 2004); *In re James Clark*, ___ F.3d ___ (5th Cir. No. 04-40451, delivered April 23, 2004); *In re Moore*, (5th Cir. No. 03-40207, delivered May 12, 2003); *In re Ladd*, (5th Cir. No. 03-40534, delivered April 23, 2003); *In re Holladay*, 331 F.3d 1169 (11th Cir. 2003) (required a sufficient showing of possible mental retardation to warrant a fuller exploration); *State v. Carter*, 913 N.E.2d 78 (Ohio App. 2004). A number of courts have placed a burden on the mentally retarded person to prove his or her disability. *See e.g., Moore v. Dretke*, 369 F.3d 844 (5th Cir. 2004); *In re Hicks*,

---

[11](...continued)
> *Texas*, 537 U.S. 802 (2002); *Tennard v. Cockrell*, 537 U.S. 802 (2002); *Bell v. Cockrell*, 536 U.S. 954 (2002); *Modden v. Texas*, 536 U.S. 954 (2002); *and Perkins v. Alabama*, 536 U.S. 953 (2002).

[12]    As a general rule, courts have not been anxious to either extend the Atkins holding or to apply it in other contexts such as ineffective assistance of counsel claims. *See e.g., Riley v. Dretke*, ___ F.3d ___ (5th Cir. No. 02-41179, delivered March 5, 2004); *Villareal v. Cockrell*, 73 F.App 742 (5th Cir. 2003) (unpublished); *Bryan v. Myullin*, 335 F.3d 1207 (10th Cir. 2003); *Smith v. Bowersox*, 311 F.3d 915 (8th Cir. 2002); *Bailey v. Weber*, 295 F.3d 852 (8th Cir. 2002) (voluntariness of plea). *But see, Brownlee v. Haley*, 306 F.3d 1043 (11th Cir. 2002) (relief on a Sixth Amendment claim of ineffective assistance of counsel).

375 F.3d 1237 (11th Cir. 2004); *Walton v. Johnson*, 269 F.Supp.2d 692 (W.D. Va. 2003); *Morrow v. State*, 2004 W.L. 1909275 (Ala. Crim. App. Delivered August 27, 2004); *In re Campbell*, 2003 WL 22682129 (5th Cir. delivered November 13, 2003) (unpublished); *and, In re Rivera*, (5th Cir. No. 03-41065, delivered August 6, 2003). The various courts are split, but the majority appear to hold that the defendant's burden of proof is by a preponderance of the evidence. *State v. Flores*, 93 P.3d 1264 (N.M. 2004); *People v. Washington*, 98 CR 2459 (Colo. Dist. Ct. Delivered April 28, 2003); *People v. Vasquez*, 84 P.3d 1019 (Colo. 2004); *Head v. Hill*, 587 S.E.2d 613 (Ga. 2003); *Johnson v. State*, 102 S.W.3d 535 (Mo. 2003); *State v. Williams*, 831 So.2d 835 (La. 2002); *and, Murphy v. State*, 54 P.3d 556 (Okla. Crim. App. 2002). Other courts have apparently reviewed the trial record themselves for evidence of mental retardation. *See e.g., Minor v. State*, 2004 W.L. 1909380 (Ala. Crim. App. Delivered August 27, 2004); *Jenkins v. State*, 2004 W.L. 363352 (Ala. Crim. App. Delivered February 27, 2004); *Emmett v. Commonwealth*, 569 S.E.2d 39 (Va 2002). Some courts have held that the determination of mental retardation by a jury is not required. *In re Johnson*, 334 F.3d 403 (5th Cir. 2003); *Head v. Hill*, 587 S.E.2d 613 (Ga. 2003), *Berry v. State*, 2004 W.L. 1470968 (Miss. Delivered July 1, 2004); *Snow v. State*, 875 So.2d 188 (Miss. 2004); *People v. Smith*, 753 N.Y.2d 809 (2002); *and, Ex parte Briseno*, 135 S.W.3d 1 (Tex.Crim.App. 2004). *But see, Burns v. Warden*, 597 S.E. 195

(Va. 2004); *Atkins v. Commonwealth*, 581 S.E.2d 514 (Va. 2003); *Pickens v. State*, 74 P.3d 601 (Okla. Crim. App. 2003) (remand for jury determination); *and,* *Lambert v. State*, 71 P.3d 30 (Okla. Crim. App. 2003). Only a few defendants have received relief. *See e.g.*, *Johns v. State*, No. CV501-0389CC (Mo. Cir. Ct, delivered July 17, 2003); *and,* *Blue v. Cockrell*, 298 F.3d 318 (5ᵗʰ Cir. 2002).

The Supreme Court's opinion in *Atkins*, *supra*, prompted discussion among the various state legislatures as well. Though great debates ensued, some states were unable to pass legislation. *See e.g.*, Alabama; Ohio; Texas. Definitions for mental retardation were adopted and varied. *See*, ARIZ. REV. STAT. § 13-703.02 (2003); COLO. REV. STAT. § 18-1.3-1101 (2002); CONN. GEN STAT. § 1-1g (2003); *and,* DEL. CODE ANN. Tit. 11 § 4209(d)(3)(d) (2003). Some states adopted intricate procedures for the determination of mental retardation. *See e.g.*, ARK. CODE ANN. § 5-4-618 (2002); CAL. PENAL CODE § 1376; COLO REV. STAT. § 18-1.3-1104 (2002); DEL. CODE ANN. Tit. 11 § 4209 (d)(3)(a) (2003); NEV. REV. STAT. 174.098 (2003); *and,* N.Y. CRIMINAL LAW § 400.27(1) (2003). Other's statutes are almost as broad as the federal statute in this case. CONN. GEN STAT. § 53A-46(h) (2003); FLA. STAT. Ch. § 921.137 (2002); KY. REV. STAT. ANN. § 532.135 (Michie 2002); MD. CODE ANN., Criminal Law §2-202 (2003); *and,* WASH. REV. CODE § 10.95.030 (2003). *But see,* TENN. CODE ANN. § 39-13-203 (2003).

The chaos and confusion which followed the *Atkins* opinion is comparable to the confusion engendered by the federal statute. The burden of proof is unassigned, and the standard of proof unknown. While the definitions of mental retardation vary from jurisdiction to jurisdiction, the basic definition remains similar. It is unsure who will make the final determination. Petitioner has demonstrated he suffers from such a disability.

Petitioner further demonstrated that he had deficits in adaptive behavior. The evidence at trial specifically demonstrated those deficits–not only through the use of well accepted psychological instruments, but also through investigation into Petitioner's life skills from childhood until trial.[13] The government attacked this finding essentially through review of Petitioner's behavior while incarcerated. The government's argument is that because Petitioner appeared to read books, quoted scripture, filled out forms, and kept a neat cell, he could not have adaptive deficits. However, none of these factors defy a diagnosis of mental retardation. As the Alabama Court held in *Morrow v. State*, 2004 W.L. 1909275 (Ala. Crim. App., delivered August 27, 2004), a diagnosis of mental retardation is not defeated by proof the defendant may write, read or process complicated information.

---

[13]    Petitioner would specifically incorporate by reference the allegations and arguments regarding adaptive deficits in the factual summary and point of error one.

Other evidence propounded by the government to demonstrate Petitioner had no deficits in adaptive behavior was from officials in the Watson Chapel School District. Petitioner maintains that such evidence did little to refute the substantial evidence presented by Petitioner's experts. When one considers the evidence developed during the habeas proceedings, Petitioner's mental retardation claim is even stronger. Long before the offense in this case Petitioner was diagnosed with a full scale IQ of 48. Through interviews with Petitioner's family, Investigator Joseph Ward learned that Petitioner attended special education classes while enrolled in an elementary school outside the Watson Chapel School District. Petitioner's former teacher, Loula Gray, believed that Petitioner should have been classified as a special education in the Watson Chapel School District. Gray states that Petitioner would have been classified as a special education student but for the racist practices in place in the School District. These racist practices were well documented to the District Court. The School District and its Superintendent were once held in contempt of court for refusing to end discrimination. Minority students were not classified as special education because such classifications made it more difficult to expel or exclude them.

Petitioner would further show that mental retardation is not a disability which a person can overcome. The determination of Petitioner's low intelligence long before this offense and trial must be accorded great weight in any determination of

mental retardation. Petitioner's mental retardation is a diagnosis made by experts hired by neither party and having no bias or prejudice. The federal statute, 18 U.S.C. 3596, does not limit mental retardation determinations to those made at trial, post trial, or by experts retained by the parties.

Moreover, prior to the District Court's Order in this case, four jurors determined that Petitioner is or may be mentally retarded. This determination was made after the lengthy presentation of evidence and after careful deliberation by these jurors. The District Court did not find this determination to be unreasonable or specifically incorrect.

Petitioner is mentally retarded. He has demonstrated significant cognitive impairment, deficits in adaptive functioning, and that his disability manifested itself well before his eighteenth birthday. His low intellectual functioning was established well before trial. Four members of his jury found that he is or may be mentally retarded. Petitioner's execution is therefore barred by the Eighth Amendment and by 18 U.S.C. 3596. Petitioner is entitled to relief.

## CONCLUSION

For the foregoing reasons, Petitioner's capital murder conviction and sentence should be reversed and reformed, or, at a minimum, a new trial on sentencing ordered.

Respectfully Submitted,

**GARY TAYLOR**
Attorney at Law
P. O. Box 90212
Austin, Texas 78709-0212
512.301.5100
512.233.2953(facsimile)
gtlaw@earthlink.net

By: _____
Gary Taylor
COUNSEL FOR Petitioner
Texas Bar No. 19691650

**PHILIP WISCHKAEMPER**
Attorney at Law
Snuggs and Wischkaemper
901 Texas Ave
Lubbock, Texas 79401
806.763.9900
806.763.9904 (facsimile)
miglit@aol.com

By: _____
Philip Wischkaemper
Texas Bar No. 21802750

**LENA ROBERTS**
Attorney at Law
P.O. Box 1738
Lubbock, Texas 79408
806.763.0044
806.763.2084 (facsimile)
Texas Bar No. 24041793

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Brief in paper and digital format was either mailed or hand delivered to Respondent by and through Delonia Watson, Assistant United States Attorney, 1700 Burnett Plaza, 801 Cherry Street, Fort Worth, Texas 76102, on this the 18th day of January, 2005.

_____
Philip Wischkaemper

## CERTIFICATE OF COMPLIANCE

## (PLACE THIS AS LAST DOCUMENT IN BRIEF BEFORE THE BACK COVER)

Pursuant to 5TH CIR. R. 32.2.7(c), the undersigned certifies this

brief complies with the type-volume limitations of 5TH CIR. R.

32.2.7(b).

1.    EXCLUSIVE OF THE EXEMPTED PORTIONS IN 5TH CIR. R.
      32.2.7(b)3),  THE BRIEF CONTAINS (select one):
      A.    9245 (total) words, OR

      B.    1120 lines of text in monospaced typeface.

2. THE BRIEF HAS BEEN PREPARED (select one):

      A.    in proportionally spaced typeface using: **WordPerfect, Times New
            Roman in14 pt font** , OR

      B.    in monospaced (nonproportionally spaced)typeface using:
            Typeface name and number of characters per inch: N/A

3.    IF THE COURT SO REQUESTS, THE UNDERSIGNED WILL PROVIDE
      AN ELECTRONIC VERSION OF THE BRIEF AND/OR A COPY OF
      THE WORD OR LINE PRINTOUT.

4.    THE UNDERSIGNED UNDERSTANDS A MATERIAL
      MISREPRESENTATION IN COMPLETING THIS CERTIFICATE, OR
      CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN 5TH CIR. R.
      32.2.7, MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND
      IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE
      BRIEF.

                                    _____
                                    Signature of filing party