# 03-11194

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH JUDICIAL CIRCUIT

---

## UNITED STATES OF AMERICA,

Respondent-Appellee,

v.

## BRUCE CARNEIL WEBSTER,

Petitioner-Appellant.

---

On Appeal from the United States District Court
for the Northern District of Texas
Fort Worth Division
District Court Numbers 4:94-CR-121-Y and 4:00-CV-1646-Y

---

## BRIEF FOR THE UNITED STATES

---

RICHARD B. ROPER
United States Attorney

DELONIA A. WATSON
Assistant United States Attorney
Burnett Plaza, Suite 1700
801 Cherry Street, Unit #4
Fort Worth, Texas 76102-6882
817.252.5200 OFFICE
817.978.3094 FAX

ATTORNEYS FOR APPELLEE

## **RECOMMENDATION ON ORAL ARGUMENT**

The government recommends against oral argument because the Court would not benefit from argument in its review of this appeal.  Both the record and the case law is clear.  Moreover, in order to find that the district court erred, this Court would have to reverse a determination made on direct appeal sans any justification for doing so.

# TABLE OF CONTENTS

**Page(s)**

RECOMMENDATION ON ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

ARGUMENT AND AUTHORITIES

    I. and II.   **The district court did not err in denying
Webster's motion for post-conviction relief** . . . . . . . . . . .  7

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

## **TABLE OF AUTHORITIES**

**Federal Cases**                                                                    **Page(s)**

*Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002) . . . . . . . . . . . 6,  8,  10, 11,  12,  18

*Forrester v. United States*, 456 F.2d 905 (5th Cir. 1972) . . . . . . . . . . . . . . . 13

*Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781 (1979) . . . . . . . . . . 7,  12,  13

*Jones v. Johnson*, 171 F.3d 270 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . 19

*Kapral v. United States*, 166 F.3d 565 (3rd Cir. 1999) . . . . . . . . . . . . . . . . . 3

*Lackey v. Johnson*, 116 F.3d 149 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . 6

*Mendoza v. United States*, 365 F.2d 268 (5th Cir. 1966) . . . . . . . . . . . . . . . 13

*Miller-El v. Johnson*, 537 U.S. 322, 123 S. Ct. 1029 (2003) . . . . . . . . . . . . . . 6

*United States v. Chavez*, 193 F.3d 375 (5th Cir. 2000) . . . . . . . . . . . . . . . . . 8

*United States v. Kimler*, 150 F.3d 429 (5th Cir. 1998) . . . . . . . . . . . . . . . . . 6

*United States v. Lacey*, 162 F.3d 1175 (10th Cir. 1998) . . . . . . . . . . . . . . . 3, 4

*United States v. Rocha*, 109 F.3d 225 (5th Cir. 1997) . . . . . . . . . . . . . . . . . 6

*United States v. Stricklin*, 290 F.3d 748 (5th Cir. 2002) . . . . . . . . . . . . . . . . 8

*United States v. Thomas*, 203 F.3d 350 (5th Cir. 2000) . . . . . . . . . . . . . . . . 3

*United States v. Webster*, 162 F.3d 308 (5th Cir. 1998) . . . . . . . . . . . . . 3,  6,  9, 10, 21

*United States v. Webster*, 392 F.3d 787 (5th Cir. 2004) . . . . . . . . . . . . . . . . 6

*Webster v. United States*, 528 U.S. 829 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Federal Statutes and Rules**

18 U.S.C. § 3596(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

28 U.S.C. § 2253 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

28 U.S.C. § 2253(c)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 U.S.C. § 2253(c)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

28 U.S.C. § 2253(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

FED.R.APP.P. 22(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

# 03-11194

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH JUDICIAL CIRCUIT

_____

## UNITED STATES OF AMERICA,

Respondent-Appellee,

v.

## BRUCE CARNEIL WEBSTER,

Petitioner-Appellant.

_____

On Appeal from the United States District Court
for the Northern District of Texas
Fort Worth Division
District Court Numbers 4:94-CR-121-Y and 4:00-CV-1646-Y

## BRIEF FOR THE UNITED STATES

_____

## STATEMENT OF JURISDICTION

Bruce Carneil Webster appeals from the denial and dismissal of his petition

for post-conviction relief under 28 U.S.C. § 2255.  He filed a timely notice of

appeal on November 10, 2003.  (R3/659.)  The district court granted a Certificate

of Appealability (COA) as to two issues.  (R3/713-714.)  The jurisdiction of this

Court is invoked under the authority of 28 U.S.C. §§ 2253 and 2255.  *See also* FED.R.APP.P. 22(b).

## STATEMENT OF THE ISSUES

1.  Whether the district court erred when it denied Webster's post-conviction claim that the evidence presented at trial was insufficient to support the court's factual finding that Webster is not mentally retarded.

2.  Whether the district court erred when it denied Webster's post-conviction claim that he is ineligible for execution because he is mentally retarded.

## STATEMENT OF THE CASE

On June 7, 1996, Webster was convicted in the United States District Court for the Northern District of Texas of three offenses related to the kidnapping and murder of Lisa Rene:  (1) kidnapping resulting in the death of Lisa Rene (count one); (2) conspiring to commit kidnapping (count two); and (3) using and carrying a firearm during a crime of violence (count six).  (R14/1406.)  After a separate punishment hearing, the jury recommended that Webster be sentenced to death on count one.  (R14/1527.)  On September 30, 1996, the district court sentenced Webster to death on count one, life imprisonment on count two, and 60 months imprisonment on count six to run consecutively to the sentence for count two.  (R15/1625-1628.)

Webster's convictions and sentence were affirmed by this Court on December 3, 1998. *United States v. Webster*, 162 F.3d 308, 317 (5th Cir. 1998). His petition for *writ of certiorari* was denied by the United States Supreme Court on October 4, 1999. *Webster v. United States*, 528 U.S. 829 (1999).

Webster filed his initial motion for relief under 28 U.S.C. § 2255, and attachments, on September 29, 2000.[1] (R1/1-174.) The government filed its response and accompanying affidavit on January 5, 2001. (R1/213-250; R2/251-297.) Webster was then permitted to file an amended section 2255 motion on August 16, 2002. (R2/304-305.) In his amended motion, Webster made 16 challenges to his conviction and sentence. (R2/407-476.) His contentions focused on six major areas: (1) ineffective assistance of trial counsel; (2) issues involving the determination of whether he is mentally retarded; (3) allegedly racially discriminatory practices in the application of the Federal Death Penalty Act (FDPA); (4) an alleged *Brady* violation; (5) the government's proffer of allegedly false and damaging testimony from two of Webster's co-defendants; and (6) the

---

[1] Because his petition for rehearing was denied by the Supreme Court on October 4, 1999, his section 2255 motion was timely filed. *See United States v. Thomas*, 203 F.3d 350, 354-355 (5th Cir. 2000) (for purposes of section 2255, one-year limitation on filing begins to run when a petition for writ of *certiorari* is denied by the Supreme Court or when the Supreme Court issues a decision on the merits); *Kapral v. United States*, 166 F.3d 565 (3rd Cir. 1999) (same); *United States v. Lacey*, 162 F.3d 1175 (10th Cir. 1998) (same).

trial court's dismissal of a juror and substitution of an alternate juror who did not participate in guilt/innocence deliberations. *Id*.

Specifically, Webster contended that

1. his rights to due process and equal protection and his right to be free from cruel and unusual punishment were violated by the racially discriminatory effects of the federal capital sentencing scheme;

2. his due-process rights were violated when the trial court made a factual finding on the issue of mental retardation that should have been made by the jury;

3. his trial counsel were ineffective in failing to investigate and present additional evidence of mental retardation;

4. his trial counsel were ineffective in failing to investigate and present evidence regarding racial bias in the school system in which Webster attended school as well as the potential biases of certain witnesses for the government;

5. his trial counsel were ineffective in failing to object to the trial court's factual finding that Webster is not mentally retarded;

6. his trial counsel were ineffective in allowing a breakdown in communication with the mitigation specialist to affect the discovery, investigation, and presentation of evidence at trial;

7. his trial counsel were ineffective in failing to investigate and present to the jury an accurate portrait of the extreme abuse suffered by Webster as mitigating evidence;

8. his trial counsel were ineffective in failing to present evidence of Webster's special talents, musical abilities, and religious devotion as mitigating evidence;

4

9. his due-process rights and his right to be free from cruel and unusual punishment were violated where the government allegedly withheld information suggesting that Webster did not receive special education services in school because of racial discrimination;

10. and 11. his due-process rights and his right to be free from cruel and unusual punishment were violated by false testimony from Steven Beckley and Marvin Holloway;

12. he is ineligible to be executed because he is mentally retarded;

13. the evidence presented at trial was insufficient to support the trial court's finding that Webster is not mentally retarded;

14. the trial court erred in dismissing a jury member and replacing him with an alternate juror after deliberations occurred at the guilt phase of the trial;

15. his due-process rights were violated because 18 U.S.C. § 3596 is unconstitutionally vague; and

16. international law prohibits his execution because he is mentally retarded.

(R2/418-419.)

On September 30, 2003, after reviewing the amended section 2255 motion, the government's response (R2/476-500; R3/501-564), and Webster's reply (R3/577-600), the district court denied the section 2255 motion in a detailed "Memorandum Opinion and Order Denying Amended Motion to Vacate Conviction and Sentence." (R3/602-641, 643.) Webster filed a notice of appeal from the court's order on November 10, 2003. (R3/659.)

5

On January 28, 2004, the district court granted Webster's application for a COA on or as to his claims that he is ineligible for the death penalty because he is mentally retarded, and that the evidence at trial was insufficient to support the court's finding that he is not mentally retarded, but denied COA on the remaining issues.[2]  (R3/663-711, 713-714.)  Webster thereafter filed an application for additional COA issues, and brief in support thereof, with this Court, which was denied on December 7, 2004.  *United States v. Webster*, 392 F.3d 787 (5th Cir. 2004).[3]

## STATEMENT OF FACTS

The evidence supporting Webster's conviction and sentence of death is summarized in this Court's opinion on direct appeal.  *Webster*, 162 F.3d at 317-319, 338.  The facts supporting the district court's factual finding that Webster is

---

[2]   The fact that the district court granted COA on these issues does not mean that the court believes them to be meritorious.  To obtain a COA, Webster must demonstrate that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Webster*, 392 F.3d at 791, quoting *Miller-El v. Johnson*, 537 U.S. 322, 327, 123 S. Ct. 1029, 1034 (2003).  Thus, the showing for obtaining a COA is lower than that required to prevail on the merits.  *See* 28 U.S.C. § 2253(c)(2); *United States v. Rocha*, 109 F.3d 225, 227 (5th Cir. 1997).  Moreover, the court may have granted COA for the same reason that it elected to review a contention already raised and rejected on direct appeal – so that this Court may analyze the issue in light of *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002).

[3]   The Court's review is restricted to the issue or issues for which a COA was granted.  28 U.S.C. §§ 2253(c)(1)(B) and (c)(3); *see also United States v. Webster*, 392 F.3d 787, 791 (5th Cir. 2004); *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997); *United States v. Kimler*, 150 F.3d 429, 430 (5th Cir. 1998).

not mentally retarded will be set forth in detail in the government's Argument and Authorities.

## SUMMARY OF THE ARGUMENT

The district court did not err when it denied Webster's motion for post-conviction relief. Webster failed to sustain his burden of showing that the court's factual finding was clearly erroneous. Because Webster cannot show that the court clearly erred when it found that he is not mentally retarded, there is no merit to his claim that he cannot be executed because he is mentally retarded. Moreover, even under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781 (1979), Webster was entitled to no relief. Webster has failed to establish any basis for this Court to rescind the decision it made on direct appeal.

## ARGUMENT AND AUTHORITIES

### I. and II.

### THE DISTRICT COURT DID NOT ERR IN DENYING WEBSTER'S MOTION FOR POST-CONVICTION RELIEF

Webster contends that the district court should have granted his motion for post-conviction relief under section 2255 because the evidence presented at trial was insufficient to support the court's factual finding that he is not mentally retarded, and because he is ineligible for execution as a result of his mental

7

retardation. There is no merit to either contention. This Court has already reviewed and rejected Webster's contentions on direct appeal. Neither the Supreme Court's opinion in *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002), nor Webster's claims that the school system in Pine Bluff is racist should change that decision.

Standard of Review

In reviewing a district court's denial of a section 2255 motion, this Court examines the factual findings for clear error and conclusions of law *de novo*. *United States v. Stricklin*, 290 F.3d 748, 750 (5th Cir. 2002); *United States v. Chavez*, 193 F.3d 375, 378 (5th Cir. 2000). Mixed questions of fact and law are reviewed *de novo*. *Id*.

The district court's denial of Webster's section 2255 motion should be affirmed

At trial, after entering a sentence of death pursuant to the jury's recommendation, the district court filed its "Factual Finding Regarding Mental Retardation," in which the court stated

> [t]he Court previously found on the record on June 18, 1996, that defendant Bruce Carneil Webster was not, as a matter of law, mentally retarded. After consideration of all the evidence and information presented in the guilt and punishment phases of trial, the Court hereby issues its factual finding that the defendant Webster is not mentally retarded and that he possesses the requisite mental capacity to understand the death penalty and why it will be imposed

on him.  As a result, the defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty.

(R15/1536.)[4]

In his amended section 2255 motion, Webster argued he is ineligible for execution because he is mentally retarded.  (R2/456-459.)  Concomitantly, he contended the evidence presented at trial was insufficient to support the district court's factual finding that he is not mentally retarded.  (R2/459-466.)  In its response, the government countered by noting that both contentions had been determined adversely to Webster by this Court in its opinion on direct appeal.[5]  (R3/523-525.)

On appeal, Webster challenged the district court's finding that he is not mentally retarded as against the greater weight and credibility of the evidence.  *Webster*, 162 F.3d at 352.  In the face of Webster's claim, this Court, using the clearly erroneous standard, found that

> [t]he government presented substantial evidence to support the finding. Furthermore, only four of the twelve jurors found that Webster is or may be mentally retarded and that he suffers from low intellectual functioning.  We

---

[4]  There is an absolute statutory bar to the execution of the mentally retarded.  *See* 18 U.S.C. § 3596(c).

[5]  The government also argued that the evidence was sufficient and pointed to such evidence in its response.  (R2/495-500; R3/501-505.)  Evidence about Webster's actions during the kidnapping, murder, and cover-up, and about his future dangerousness also contradicted his claim that he is mentally retarded.  (R2/481-489, 490-494.)

cannot say the court clearly erred in deciding that Webster is not mentally retarded.

*Webster*, 162 F.3d at 353.  The Court went on to explain:

> Webster's failure to convince a majority of the jurors alone suggests the court's finding is not inconsistent with the verdict.  Furthermore, those four jurors found only that he is or may be mentally retarded.  Obviously, this mitigating factor requires less certainty than does the determination that he is not mentally retarded.  As a result of this lesser standard, we can conclude that eight jurors were not convinced that he even "may be" mentally retarded; they believed he was not.  We cannot conclude that the court's agreement with a majority of the jurors constitutes a clear, obvious error.

*Id.*

In the section 2255 proceedings, although agreeing that both Webster's claims had been raised and rejected on direct appeal, the district court elected to consider both because of the Supreme Court's intervening decision in *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002).  (R3/609-610.)  In *Atkins*, the Supreme Court held in light of its "evolving standards of decency," that the execution of the mentally retarded is cruel and unusual punishment under the Eight Amendment.  *Atkins*, 536 U.S. at 321, 122 S. Ct. at 2252.

Upon review, however, the district court concluded that Webster was not rendered ineligible for the death penalty under *Atkins*.  (R3/633-634.)  The district court did not err in making this determination because the Supreme Court's

opinion in *Atkins* does nothing more than declare unconstitutional what is already statutorily banned by section 3596(c). Although noting that the American Association of Mental Retardation (AAMR) and the American Psychiatric Associations define mental retardation similarly, *Atkins*, 536 U.S. at 308 n.3, 122 S. Ct. at 2245 n.3, the *Atkins* decision mandates neither a definition nor a standard for the determination of mental retardation.[6] The Supreme Court explained that, "[t]o the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded," and that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Atkins*, 536 U.S. at 317, 122 S. Ct. at 2250. The *Atkins* Court made

---

[6] "The American Association on Mental Retardation (AAMR) defines mental retardation as follows: 'Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.' Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992). The American Psychiatric Association's definition is similar: 'The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system.' Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000)." *Atkins*, 536 U.S. at 308 n.3, 122 S. Ct. at 2245 n.3.

clear that each state would have to determine for itself the protocol for such a

determination: "As was our approach in *Ford v. Wainwright*, 477 U.S. 399, 106 S.

Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, 'we leave to the State[s]

the task of developing appropriate ways to enforce the constitutional restriction

upon [their] execution of sentences.'" *Atkins*, 536 U.S. at 317, 122 S. Ct. at 2250.[7]

Consequently, even after *Atkins*, a defendant must still show that he is

mentally retarded in order to avoid execution on Eighth Amendment grounds or

statutory grounds. The district court did not err here when it concluded, based on

the evidence presented at trial, that Webster had failed to show that he is mentally

retarded.

In his amended motion, Webster argued that the district court should

employ the standard set out in *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781

(1979), in determining whether the evidence was sufficient. (R2/464.) In

*Jackson*, the Supreme Court examined the question of what standard should be

applied in a federal habeas corpus proceeding when the claim is made that a

---

[7] The Supreme Court took pains to note that the Commonwealth of Virginia disputed that Atkins suffered from mental retardation. *Atkins*, 536 U.S. at 317, 122 S. Ct. at 2250. And the Court made no determination that Atkins in fact is mentally retarded; instead, the Court remanded the case to the Virginia Supreme Court for further proceedings not inconsistent with its opinion. *Atkins*, 536 U.S. at 321, 122 S. Ct. at 2252.

person has been convicted in a state court upon insufficient evidence. *Jackson*, 443 U.S. at 309, 99 S. Ct. at 2783. The Court held

> that in a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 – if the settled procedural prerequisites for such a claim have been otherwise satisfied – the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt.

*Jackson*, 443 U.S. at 324, 99 S. Ct. at 2791-2792. *Jackson* is inapplicable here, however, because Webster was convicted in a federal court and raises his contention in a section 2255 proceeding.

Moreover, as the government argued in its section 2255 response (R3/524), a petitioner may not question the sufficiency of evidence for his conviction in a section 2255 proceeding. *See Mendoza v. United States*, 365 F.2d 268, 272 (5th Cir. 1966); *Forrester v. United States*, 456 F.2d 905, 907 (5th Cir. 1972) (sufficiency of evidence to sustain a defendant's conviction is not a contention cognizable on a collateral motion under section 2255). Likewise, Webster should not be permitted to challenge the sufficiency of the evidence supporting the district court's factual finding.

In any event, Webster would be entitled to no relief even if the *Jackson* standard were applied. In its denial of the motion, the district court explained that

13

[i]t is highly unlikely that the "beyond a reasonable doubt" standard would be applicable to a factual finding on mental retardation, as this standard would imply that the government bore the burden of doubt of establishing "beyond a reasonable doubt" that a federal defendant is *not* retarded, which the opinion in *Atkins* does not even suggest. However, even were *Atkins* to require some greater standard of review than the "clear error" standard already used by the Fifth Circuit, such as the *Jackson* standard, viewed in the light most favorable to the prosecution, a rational fact-finder could have found that Webster is not mentally retarded based upon the evidence presented at trial.

(R3/627.)

Using the definition for mental retardation set out in *Atkins* and used by Webster, the district court again concluded that the evidence at trial supported a finding that Webster is not mentally retarded. (R3/628, 633.) In denying relief to Webster, the district court exhaustively set out the evidence it considered on the highly contested issue:

Webster called four expert witnesses who testified about his mental capacity, including Dr. Raymond Finn, Dr. Denis Keyes, Dr. Robert Fulbright, and Dr. Mark Cunningham. Webster was given different I.Q. tests by some of these experts, and he scored between a composite score of between a 51 and a 65. (R. 23:184-94; R. 24:20). Webster's experts agreed that an I.Q. score of around 70 or lower, along with a lack of adaptive skills and the onset of these deficits before the age of 18, are the criteria for a diagnosis of mental retardation. (R. 23:183, 229-30). [Footnote omitted.] In order to assess Webster's adaptive skills, Dr. Keyes used the Vineland test, which involved asking numerous questions of people who knew Webster before he was eighteen, including family members, teachers, and friends, but dropping those answers that are inconsistent with the

14

answers of most of the interviewees. (R. 24:36-42). From this, Keyes determined that Webster lived at home, did not have a bank account or a charge card, and was never observed setting the dinner table, assisting in the preparation of meals, or making his bed. He also determined that no one had known Webster to keep secrets or confidences or address envelopes on his own. (R. 24:44-5, 73-6). Dr. Keyes testified that he did not speak to Webster's fellow gang members or police officers who had dealt with him before he was eighteen-years-old in reaching his results on the Vineland test. (R. 24:82-4). Based on this test, Dr. Keyes opined that Webster did have a lack of adaptive skills. Based on the I.Q. scores, along with this adaptive skills test and evidence from family members that Webster had been "slow" as a child, all of Webster's experts diagnosed him as being mentally retarded. (R. 24:43, 47, 144, 189). Both Dr. Finn and Dr. Keyes acknowledged that cultural factors can have an effect on I.Q. scores. (R. 23:212; R. 24:59), and Dr. Keyes testified that the I.Q. tests required Webster to define words and recognize faces, and he did not know the definition of "inflation," nor did he recognize pictures of Shakespeare, Mark Twain, or Einstein, but he did recognize Elvis Presley and Stevie Wonder. (R. 24:60-2). Dr. Keyes also testified that Webster had reading and writing abilities that were unusual in a person with his alleged level of retardation and that Keyes attributes this to his belief that Webster probably suffers from "inorganic," as opposed to "organic" retardation. (R. 24:48, 111). Dr. Keyes also acknowledged, upon being questioned by this Court, that evidence that Webster was a leader in the kidnaping plot would be inconsistent with a diagnosis of mental retardation and that, in his opinion, it would have been "unlikely" that Webster was the one who physically took the victim. (R. 24:102).

The government, on the other hand, offered testimony from two experts, Dr. George Parker and Dr. Richard Coons. Dr. Parker testified that he administered an I.Q. test to Webster and his composite score was a 72. (R. 26:49). Dr. Parker and Dr. Coons testified that they did not believe that Webster is mentally retarded. (R. 26:143). Both Parker and Coons believed that Webster was not motivated to do well on I.Q. tests administered after he was charged

15

in this case, and pointed as evidence of this to prior tests where he scored higher, such as tests given to him when he was in junior high, when he was in prison previously, and when he was in the Job Corps. (R. 26:51-3, 60-1, 63, 67, 126, 142). Parker also observed that the fact that someone like Webster lived in a sub-culture in which he was not exposed to a lot of vocabulary could cause his I.Q. scores to be lower. (R. 26:50-51).

Primarily, however, Parker and Coons questioned the results obtained by the defense when the test was administered to determine Webster's adaptive skills. Parker testified that he did not believe that the Vineland test was appropriate in Webster's case because of Webster's lifestyle, namely that of a drug dealer. Because of choices that Webster had made in his life, and because Webster had been in prison most of the time since he was fifteen years old, Parker and Coons believed that he would rate deceptively poor on the Vineland test. Dr. Parker and Dr. Coons also disputed some of the results Dr. Keyes did obtain with the Vineland test. Specifically, Dr. Keyes had indicated on the test that Webster's family members stated that Webster did not speak in complete sentences, did not read simple stories aloud, and did not read on his own initiative, when both the two experts and officers at the prison where he was housed after being charged in the instant case had observed that Webster did all of these things. Moreover, his family had stated that they did not know whether Webster addressed envelopes, put his clothes away, or made his own bed, whereas Parker had in his possession an envelope Webster had addressed and had observed that Webster put his clothes away and made his bed in his jail cell. (R. 26: 58-9, 136-39). Parker and Coons also noted that Webster had shown cleverness when he sneaked into the women's part of the jail at one point, and he had shown the ability to adapt to the life he had chosen, as well as life in prison. (R. 26:143-44). Furthermore, Webster had shown adaptability by being deceitful to the police by way of cover stories and excuses when he was arrested with a motel key in his pocket, and had the adaptive ability to destroy evidence when he burned his clothes after Lisa Rene's murder. (R. 26:65-6).

16

Moreover, the government placed into evidence the testimony of Greg Barber, Webster's former parole officer, Gene Stewart, who was the principal at the junior high that Webster attended, and Rick McLaughlin, the vice-principal at that same school. They all testified that they did not believe that Webster was mentally retarded and that, when they were visited by Dr. Keyes earlier and told him their opinions, he told them that they could not help him because he was trying to keep Webster from being executed, a charge he disputed in his testimony. (R. 25:26-8, 238, 239-40, 247-48, 249). Moreover, E.C. Turner, Pat Drowett, and Linda Monk, a counselor and two teachers from the junior high Webster attended, testified that in their opinion, while Webster was in "basic" classes at school rather than advanced classes and dropped out in the ninth grade, he is not retarded. (R. 25:34-70). Finally, two fellow inmates and several officers from the federal prison where Webster had been housed for some time testified that Webster wrote letters to other inmates, albeit in almost indecipherable slang, received letters and newspapers, read aloud from the newspapers, wrote request slips for various services, wrote written grievances, submitted names and addresses of people for his visitation list, appeared to be reading from law books in the law library and taking notes, and on one occasion complained because the change he had received after purchasing materials from the commissary was incorrect. (R. 25:86-103, 111-18, 122-25, 128-30, 136-38, 141-46; R. 26:24-35).

In summary, all of the experts who testified at Webster's trial, including those who testified for the government, acknowledged that Webster has a low IQ. The experts disagreed about how low, but even a 72 I.Q. falls into the range where one can be diagnosed as mentally retarded, if one also has a deficit in adaptive skills. (R. 26:85-6). And the issue of adaptive skills or the lack thereof is where the parties converged at Webster's trial. While the defense did place into evidence the results of the Vineland test, government witnesses effectively reputed some of those findings with direct evidence that Webster has adapted to his environment and does possess skills that his family stated that he did not. Looking at all of the evidence presented by both sides at trial, while it is undisputed that Webster

17

has had low scores on almost every I.Q. test that has been administered to him, these scores are, according to even defense witness Dr. Keyes, attributable to "nonorganic" factors, which this Court understands to mean his lack of a quality formal education and any positive or productive home life.  Nevertheless, the evidence presented at trial does reflect that Webster has adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the "home" he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math.  This evidence therefore supports a finding that Webster does not have a deficit in adaptive skills.  *See Atkins*, 536 U.S. at 308, n. 3.  The evidence at trial therefore supports a finding that Webster is not mentally retarded and therefore is not rendered ineligible for the death penalty under either *Atkins* or 18 U.S.C. § 3596(c).

(R3/628-634.)[8]

In its response to Webster's amended motion, the government pointed to other evidence showing that Webster did not lack adaptive skills.  The government presented testimony from John Clay, which focused on a letter written by Webster's own hand that set forth a "plan" for a sexual rendezvous with female inmates.  (R48/85-97; GE 121-A.)  It is evident from the record that Webster concocted an elaborate scheme to manipulate the detention center's visitation system and sought Clay's assistance.  *Id.*  The government also proved up an

---

[8]  Normally the government would not quote such a long passage but including *in toto* the court's explanation of the facts it considered is the most succinct method to convey the relevant facts.

incident where Webster, while he was incarcerated and awaiting trial, escaped from his area of the jail into the women's area of the jail.  (R45/175-190, 200-207.)  The testimony showed that Webster had waited until all the cells in his area had been unlocked between 4:00 and 4:30 a.m. to allow another inmate to get ready to go to court.  Webster left his cell, then used a wire to unlatch a food chute.  Webster squeezed through the food chute, and then made his way into the women's shower area where he was discovered.

Although Webster may have scored low on several I.Q. tests, a low I.Q. score alone is insufficient to prove mental retardation.  *See, e.g., Jones v. Johnson*, 171 F.3d 270, 276 (5th Cir. 1999) ("a showing of borderline or below average intelligence does not constitute a showing of mental retardation.").  Webster may be a person with low intellectual functioning, but a diagnosis of mental retardation also requires significant deficits in adaptive skills.[9]  (R47/9.)  The record clearly

---

[9]  The government submits that Webster scores poorly on I.Q. tests when he has no incentive to make a higher score.  When Webster has no disincentive to score higher, he is capable of doing so.  (R29/51-3, 60-1, 63, 67, 126, 142.)  There was other evidence showing that Webster functions much higher than his I.Q. scores would indicate.  For example, a highway patrolman with the Arkansas State Police testified that, on June 15, 1992, Webster scored 96 percent on the multiple choice portion of his driver's license examination and 70 percent on the signs portion of the exam.  The officer testified that there were three versions of the test and that the version that is actually given is selected at the time the person takes the test.  In order to cheat by receiving the answers to the test beforehand, a person would have to memorize 75 multiple choice questions and 30 road signs.  (R50/225-232; GE 95.)  Luther Alexander, a detention officer, testified that he saw Webster in the law library of the jail almost everyday that it was available, and he saw Webster reading and taking notes from the law books.  (R51/128-129.)  Once when Webster made an oral complaint Alexander told him to fill out a complaint slip, but

supports the court's conclusion that Webster failed to show the requisite lack of adaptive skills.[10]

Furthermore, despite the voluminous evidence produced by Webster and the relaxed standard provided for mitigation findings, Webster was able to convince only four jurors that he is mentally retarded or <u>might be</u> mentally retarded. Obviously, the "might be" language inured to Webster's benefit because a juror could have voted affirmatively for the mitigation factor even if he or she was not completely convinced that Webster was retarded. Webster had a full opportunity to prove to the jury that he is mentally retarded, including the use of several experts. He was unable to do so.

---

Webster responded that he could not because his attorney had told him not to fill out any more complaint slips. (R51/129-130.) Before that time, Webster had been prolific in his written requests. The government introduced numerous written request forms and complaint forms made by Webster while he was incarcerated in the Mansfield Law Enforcement Center awaiting trial. (R52/23-33; GE 117-B, 117-C, 117-D, 117-E, 117-F, 117-H, 117-J). The defense stipulated that these requests and complaints, and letters to John Clay and one of Webster's co-defendants were in Webster's handwriting. (R52/39-41; GE 121-A, 132-A.)

[10]    Dr. Parker observed inconsistencies between Webster's behavior and what Dr. Keyes reported on his Vineland. Dr. Keyes marked the Vineland scale "don't know" for the category "speaks in complete sentences," but Dr. Parker observed that Webster spoke in full sentences. (R52/58.)   Dr. Keyes scored a "1" for the category "reads simple stories," and a "0" for the category "reads on own initiative." (R52/58.) Dr. Parker observed that Webster could read simple stories and did, in fact, read on his own initiative. (R52/58.) Dr. Keyes also marked "don't know" for the category "addresses envelope," whereas Dr. Parker observed envelopes that were addressed by Webster. (R52/59.) Dr. Keyes scored "0s" for the categories "puts clean clothes away" and "makes own bed," whereas Dr. Parker observed that Webster kept his cell neat and his bed was neatly made. (R52/57-59).

This Court has already determined that the government presented substantial evidence in support of the district court's finding that Webster is not mentally retarded, and that the district court did not clearly err in concluding that Webster is not mentally retarded.  *Webster*, 162 F.3d at 352-353.  The Supreme Court's intervening decision in *Atkins* does nothing to change that conclusion.  Moreover, Webster's claims that he was not placed in special education classes because of racism in his school district is wholly irrelevant because the focus of the district court's decision was Webster's failure to show a deficiency in adaptive skills.  Racism in the school system – no matter how pervasive or pernicious – adds nothing to this matter, and, certainly, does not justify any change in this Court's holding.

Webster has failed to show that the district court erred when it determined that the trial evidence was not insufficient to support its finding that Webster is not mentally retarded.  Consequently, there is also no merit to his claim that the court should have found that he is ineligible to be executed because he is mentally retarded.[11]

---

[11]   Other than pointing to racism in the school system that prevented his placement in special education, Webster offered no new evidence in his amended motion for section 2255 relief supporting his contention that he is mentally retarded than what was presented on direct appeal.  Thus, a determination that the district court did not err when it denied his claim that the evidence presented at trial was insufficient to support the court's factual finding moots his claim that he is ineligible for execution based on mental retardation.

**CONCLUSION**

For the foregoing reasons, the district court's denial of Webster's section 2255 motion should be affirmed.

Respectfully submitted,

RICHARD B. ROPER
United States Attorney

_____

DELONIA A. WATSON
Assistant United States Attorney
Texas State Bar Number 20937500
Burnett Plaza, Suite 1700
801 Cherry Street, Unit #4
Fort Worth, Texas 76102-6882
Telephone:  817.252.5200
Facsimile:   817.978.3094

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 24th day of March, 2005, the original and three copies of the foregoing were sent via Federal Express to the Clerk of the United States Court of Appeals for the Fifth Circuit, and two copies of the same were likewise served on Mr. Gary Taylor, counsel for Webster, P. O. Box 90212, Austin, Texas  78709-0212; Mr. Philip Wischkaemper, counsel for Webster, Snuggs & Wischkaemper, 901 Texas Avenue, Lubbock, Texas 79401; and Ms. Lena Roberts, counsel for Webster, Boerner & Dennis, P.O. Box 1738, Lubbock, Texas, 79408, via the United States mail.

_____
DELONIA A. WATSON
Assistant United States Attorney

# CERTIFICATE OF COMPLIANCE

Pursuant to 5th CIR. R. 32.2.7(c), the undersigned certifies this brief complies with the type-volume limitations of 5th CIR. R. 32.2.7(b).

1.    EXCLUSIVE OF THE EXEMPTED PORTIONS IN 5th CIR. R. 32.2.7(b)(3), THE BRIEF CONTAINS:

    6038   words

2.    THE BRIEF HAS BEEN PREPARED:

    in proportionally spaced typeface (WORDPERFECT, Version 9) using Times New Roman in 14 point.

3.    THE UNDERSIGNED UNDERSTANDS A MATERIAL MISREPRESENTATION IN COMPETING THIS CERTIFICATE, OR CIRCUMVENTION OF THE TYPE-VOLUME LIMITS IN 5th CIR. R. 32.2.7, MAY RESULT IN THE COURT'S STRIKING THE BRIEF AND IMPOSING SANCTIONS AGAINST THE PERSON SIGNING THE BRIEF.


_____
DELONIA A. WATSON
Assistant United States Attorney