**03-11194**

**CAUSE NO.** 03-11194

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**BRUCE CARNEIL WEBSTER, APPELLANT**

V

**THE UNITED STATES OF AMERICA**

U.S. COURT OF APPEALS

OCT 24 2005

CHARLES R. FULBRUGE III
CLERK

On Appeal from the United States District Court

for the Northern District of Texas,

Fort Worth Division, Honorable Terry Means presiding

APPELLANT'S MOTION FOR REHEARING EN BANC

**PHILIP WISCHKAEMPER**
Attorney at Law
Snuggs and Wischkaemper
915 Texas Ave
Lubbock, Texas 79401
806.763.9900
806.763.9904 (facsimile)
miglit@aol.com

**CAUSE NO.** 03-11194

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**BRUCE CARNEIL WEBSTER, APPELLANT**

**V**

**THE UNITED STATES OF AMERICA**

On Appeal from the United States District Court

for the Northern District of Texas,

Fort Worth Division, Honorable Terry Means presiding

APPELLANT'S MOTION FOR REHEARING EN BANC

**PHILIP WISCHKAEMPER**
Attorney at Law
Snuggs and Wischkaemper
915 Texas Ave
Lubbock, Texas 79401
806.763.9900
806.763.9904 (facsimile)
miglit@aol.com

# CERTIFICATE OF INTERESTED PARTIES

1.**Bruce Carneil Webster**, United States Penitentiary, P.O. Box 33, Terre Haute, Indiana 47808.

2. **Philip Wischkaemper**, Habeas Corpus Attorney, 915 Texas Ave, Lubbock, Texas 79401.

3. **Honorable Terry Means**, United States District Judge, 501 West 10th Street, Room 201, Ft. Worth Texas, 76102.

4. United States Attorneys,  **Paul Macaluso, Richard Roper, Delonia Watson,** 1700 Burnett Plaza, 801 Cherry Street, Fort Worth, Texas 76102.

## RULE 35(b)(1) STATEMENT

This Motion for Rehearing En Banc complies with F.R.A.P. 35(b)(1)(B) because the case involves a question of exceptional importance. Atkins v Virginia, left it to the lower courts and states to devise the standards by claims of mental retardation can be evaluated; the panel's opinion is the first such effort to define those standards for the federal statute, which has no definition. The panel opinion, however, defines mental retardation in a fashion different than that determined by the Supreme Court in **Atkins** and other cases. Those cases define mental retardation in the same clinical definition adopted by both the American Association for the Mentally Retarded, the AAMR and the American Psychological Association, APA. The panel opinion, on the other hand, defined or decided Webster's MR claim, not on the basis of the clinical definition but in such a fashion that plays more into misconceptions about mental retardation than what is demanded by science. The clinical definition contemplated by the Supreme Court also contemplates evaluation by those skilled and experienced in assessing mental retardation. This "clinical judgment" has a meaning specific to mental retardation not common to other areas of psychological assessment. By relying on these unqualified opinions, the panel opinion relied upon judgments that do not comply with the Supreme Court's mandate of a clinical definition.

ii

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PARTIES

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

**RULE 35(b)(1)  STATEMENT**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

**TABLE OF CONTENTS**

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

**TABLE OF AUTHORITIES** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF THE ISSUES MERITING EN BANC CONSIDERATION . vii

**STATEMENT OF THE COURSE OF PROCEEDINGS** . . . . . . . . . . . . . . . 1

**ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

**CONCLUSION**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

**CERTIFICATE OF SERVICE**  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# TABLE OF AUTHORITIES

*28 U.S.C. Sec. 2255 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Atkins v Virginia,* 536 U.S. 304 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*City of Cleburne v Cleburne Living Center*, 473 U.S. 432, 442, fn 9 (1985) . . . 8

*Heller v Doe*, 509 U.S. 312, 321, 22 (1993) . . . . . . . . . . . . . . . . . . . . . . . . 8

*Penry v Lynaugh* 492 U.S. 302 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Schriro v Smith*, ___ U.S. ___ (#04-1475, October 18, 2005). . . . . . . . . . . . . . . 6

*Barnes v Barnhart,* 102 Soc.Sec.Rep. Service 31 (10th Circ. 2004) . . . . . . . . . . 6

*Morris v Dretke*, ___ F.3d ___ (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 8

AAMR treatise of Mental Retardation, Mental Retardation: Definition,
Classification, and Systems of Support (AAMR 2002) . . . . . . . . . . . . . . . . . . . . . 8

James W. Ellis, Mental Retardation and the Death Penalty: A Guide to State
Legislative Issues , 27 Mental and Physical Disability L. Rep. 11 (ABA 2003).
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Peggy Tobolowsky, Atkins Aftermath: Identifying Mentally Retarded Offender
and Excluding Them from Execution.  30 Journal of Legislation 77, 89  (2003).
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**STATEMENT OF THE ISSUES MERITING EN BANC CONSIDERATION**
I.
THE PANEL OPINION DECIDED MR. WEBSTER'S CLAIM OF MENTAL
RETARDATION WITHOUT REFERENCE TO THE
SCIENTIFIC STANDARDS REQUIRED BY *ATKINS V VIRGINIA*

## STATEMENT OF THE COURSE OF PROCEEDINGS

Mr. Webster filed his 28 U.S.C. § 2255 Motion with the United States District Court for the Northern District of Texas, Fort Worth Division, on September 29, 2000. The District Court denied Webster's § 2255 Motion on September 30, 2003, but granted a Certificate of Appealability on two issues: (1) whether Webster is ineligible for the death penalty because he is mentally retarded; and, (2) whether the evidence at trial was insufficient to support the court's finding that Webster is not mentally retarded. The panel denied relief on August 11, 2005.

### Statement of Facts

Mr. Webster is, contrary to the panel opinion, mentally retarded. All of the experts agreed that Webster's IQ met the standards for mental retardation. Therefore, this case depends on whether he manifested, before the age of 18, sufficient deficits in adaptive deficits to warrant a conclusion of mental retardation.[1]

---

[1] Dr. George Parker testified that using his abbreviated Weschler, Webster's IQ was 72. The government sought to establish that that score was above the cut off for mental retardation. Parker acknowledged that there was a standard error of measurement but stated only that the cut off was approximately 70. ( R. Vol 26, P. 48-52) In fact, as the AAMR treatise of Mental Retardation, Mental Retardation: Definition, Classification, and Systems of Support (AAMR 2002) hereinafter referred to as AAMR, makes clear, the actual cut off score is 70 to 75 because of that standard error of measurement. AAMR at p. 57-8. While no reputable expert would use an abbreviated test, ( R. Vol 26, P. 76-7) it

1

Mr. Webster was so mentally limited that a co-defendant, Marvin Holloway had to make flight arrangements and buy the ticket. Mental retardation ran throughout his family. Webster went to prison where he attended school. After four years he yet to qualify for his GED and the "good time" credit that went with it. (R.22:98, 102). He never had a bank account, credit card or his own apartment. He always lived with someone who did everything for him. (R.23:154). His mother bought him a car and his girlfriend paid the insurance on it. He subsisted on money from family as well as welfare and food stamps. (R.22:47, 64, 65; 23:133, 145, 150).

Webster was evaluated in 1992 by the Southeast Arkansas Mental Health Clinic. His Wechsler Adult Intelligence Scale (WAIS) showed a score of 48, well within the retarded range. (R.23:177, 178). Dr. Raymond Finn tested Webster and obtained an IQ score of 59. (R.23:187). [2] These scores, coupled with Webster's

---

is clear that Mr.Webster's intellectual functioning met the standards for mental retardation. See also Tobolowsky, infra at p. 96 "Thus, any state's use of a fixed IQ cutoff score, without reference standard measurement error and other factors concerning the specific instrument used, risks an inaccurate assessment of the intellectual functioning component of the mental retardation definition."

[2]. Dr. Finn concluded that Webster was retarded. (R.23:189), consistent with the earlier Arkansas testing. Immediately before trial Dr. Finn administered another test and expected Webster to be "better" because of the "practice effect." Webster's score improved, receiving an IQ score of 65, still well within the mental retardation range. (R.23:192, 193).

2

adaptive skills, indicated mental retardation. (R.23:193).[3] Dr. Denis Keyes, a recognized specialist in mental retardation,[4] administered a Stanford-Benet Intelligence test on which Webster scored in the lowest .2 percent of the population with a composite score of 51. (R.24:20). If 1,000 people lined up in accordance with their intelligence, Webster would be the second from the last. Dr. Keyes wrote his dissertation on malingering and was initially suspicious of Webster's low scores. He functioned verbally at a higher level than his IQ scores indicated. (R.24:46, 47). Other testing revealed unexpected reading and writing skills which made Keyes give yet another intelligence test (the Kaufman). The results were similar to the Stanford-Benet --a composite score that put Webster below the first percentile. Dr. Keyes, therefore, concluded that Webster was not malingering. (R.24:31). Dr. Keyes also conducted a Vineland Social Maturity and Adaptive Behavior Scale to examine Webster's ability to function in the every day world.[5] Because mental retardation has an onset prior to age 18, Keyes had to

---

[3]. Dr. Finn noted Webster's word knowledge was one of his stronger points, but he cannot draw inferences, make general statements or conclusions. Webster could absorb only the rudiments of school and could communicate only at a basic level. (R.23:193, 194). In short, while he could read, he could not understand what he had read.

[4] See Ellis infra, footnote 44.

[5]. Keyes assessment of Webster's adaptive deficits came from four days of interviews he utilized to complete the Vineland Adaptive Skills Test. Keyes interviews were of individuals in Webster's hometown and with individuals who knew him during

3

interview people who had significant, ongoing contact with Webster before he turned eighteen. (R.24:38, 39).Based on all of his findings, Dr. Keyes concluded that Webster functioned at the level of a six or seven year old child. (R.24:43, 44). Webster was unable to see the consequences of his actions, unable to plan situations appropriately, unable to think in abstract methods, unable to communicate under certain circumstances, and had a poor short term memory. He had difficulty concentrating on a task, was very distractable, and could not learn from his mistakes in many situations. (R.24:47, 48). Webster suffered from both organic (brain damage) and non-organic (environmental) mental retardation. (R.24:95). Dr. Fullbright administered a battery of tests, the scores of which were also consistent with mental retardation.

## ARGUMENT

The panel opinion noted that all of the experts found that Webster's IQ was very, very low. *USA v Webster* slip opinion at p. 5. The panel opinion adopted the District Court's holding:

> [T]he issue of adaptive skills or the lack thereof is where the parties converged at Webster's trial. While the defense did place into evidence the results of the Vineland test, government witnesses effectively reputed some of those findings with direct evidence that Webster had adapted to his environment and does possess skills which his family stated he did not.

---

the developmental period.

4

> Looking at all the evidence presented at trial, while it is undisputed that Webster has had low I.Q. scores on almost every I.Q. test that has been administered to him, these scores are, according to even defense witness Dr. Keyes, attributable to "non-organic" factors, which this Court understands to mean his lack of quality formal education and any positive or productive home life. Nevertheless, the evidence presented at trial does reflect that Webster has adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the"home" he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math. The evidence therefore supports a finding that Webster does not have a deficit in adaptive skills.

Slip opinion at p. 6 quoting from *USA v Webster* (district court opinion at p. 14.).

The panel opinion noted in a footnote that the government experts believed that the Vineland test administered was an "inappropriate and deceptive measure of Webster's adaptive skills, given his lifestyle as a drug dealer.

> Moreover, government experts noted that Webster had shown cleverness and adaptability when he sneaked into the women's portion of the jail in which he was held, concocted cover stories and made excuses to police when he was arrested with a key in his pocket to the motel room in which Lisa Rene was held and raped repeatedly, and burned his clothes to destroy evidence after her murder."

The panel opinion also noted that Webster wrote letters to other inmates, received letters and newspapers; read aloud from newspapers, wrote request slips for various services, etc. Id at footnote 15. The opinion also noted that the government's experts had decried the use of the Vineland as inappropriate and

5

deceptive. Id. [6] In short, both the District Court and the panel concluded that Webster was not retarded because his alleged disability did not affect every aspect of his life; there were things he could do and this ability placed him above the level of retardation.

None of this has anything to do with the clinical definition of mental retardation, a definition which includes not just standards for the patient but for those who assess the level of disability as well.

*Atkins v Virginia,* 536 U.S. 304 (2002) left it to the states and, for the federal statute, the lower federal courts to devise standards and procedures for implementing the decision.  That deferment, however, has limits. Those standards and procedures that violate the constitution may themselves be subject to constitutional challenge. *Schriro v Smith*, ___ U.S. ___ (#04-1475, October 18, 2005).

*Atkins* sets a constitutional threshold for mental retardation: all defendants who "fall within the range of mentally retarded offenders about whom there is a national consensus" are exempt from execution.536 U.S. 304, 317 and fn 22

---

[6]. The opinions of Drs. Coons and Parker on the efficacy of the Vineland test are best rebutted by the AAMR's own description of the instrument: "Data from reliability and validity studies of Vineland -S are very good, especially in light of the flexible conversation format for obtaining rating information." AAMR at p. 88.

(2002). While states and the lower federal courts may adopt minor differences in the definition, "they cannot adopt a definition that encompasses a smaller group of defendants, nor fail to protect any individuals who have mental retardation under the definition embodied in the national consensus." James W. Ellis, Mental Retardation and the Death Penalty: A Guide to State Legislative Issues , 27 Mental and Physical Disability L. Rep. 11 (ABA 2003).

That national consensus is the clinical definition set forth  by what the Supreme Court called "the country's oldest and largest organization of professionals working with the mentally retarded," the American Association on Mental Retardation, the AAMR, and by the American Psychiatric Association. The definitions of each organization while different, essentially address the same results. See *Morris v Dretke*, ___ F.3d ___ (5ᵗʰ Cir. 2005).

The Court relied on the same organization's definition in *Atkins*. That definition "refers to substantial limitations in intellectual functioning.  The APA definition is similar. [7]  The Supreme Court has expressly referenced these clinical definitions in both *Penry v Lynaugh* 492 U.S. 302 (2002) and *Atkins* and it is those offenders who meet this clinical definition that fall within the national

---

[7] 536 U.S. at p. 308, fn 3, citing AAMR, Mental Retardation: Definition, Classification and Systems of Support, at p. 5 (9ᵗʰ ed 1992); APA, DSM-IV_TR, at pp. 41, 42-43).

consensus. [8]  Peggy Tobolowsky, Atkins Aftermath: Identifying Mentally

Retarded Offender and Excluding Them from Execution.  30 Journal of

Legislation 77, 89  (2003). [9] Indeed, all death penalty jurisdictions, including the

United States, must now adopt procedures and definitions that are adequate to

implement the constitutional ban.  Tobolowsky at p. 86.[10]

The definition requires a  performance level at least two standard deviations

below the mean on one of three general types of adaptive behavior: conceptual,

social, or practical.  These assumptions, according to the AAMR, are part of the

definition's application:

> Assumption 1: "Limitations in present functioning must be considered
> within the context of community environments typical of the individual's

---

[8] *Penry* and *Atkins* aren't the only Supreme Court references that have adopted the AAMR guidelines. See *Heller v Doe*, 509 U.S. 312, 321, 22 (1993) (referring to the AAMR and APA definitions in discussing the nature of mental retardation); *City of Cleburne v Cleburne Living Center*, 473 U.S. 432, 442, fn 9 (1985) ( referring to the AAMR definition).   This Court also adopted these definitions in *Morris v Dretke* supra.

[9] Of the 18 sates that had adopted statutory bans on the execution of the mentally retarded before *Atkins*, 15 incorporated all three elements of the AAMR definition.  30 J.Legis at p. 90.  Of the ten states to have to have adopted standards since *Atkins*, al ten have adopted the AAMR definition. Id at 92. Tobolowsky contends that because fifteen of the 18 pre *Atkins* states that had abolished the death penalty for the retarded had incorporated all of the AAMR elements in their respective definition, that trend formed the national consensus that those meeting that definition should not be executed.

[10] It is not only in the criminal arena where the failure to follow the various clinical definitions of retardation has resulted in reversals of lower federal courts. In *Barnes v Barnhart,* 102 Soc.Sec.Rep. Service 31 (10th Circ. 2004), the Tenth Circuit reversed the determination of an Administrative Law Judge who applied his own sense of mental retardation ignoring the clinical definitions.

age peers and culture." This means that the standards against which the individual's functioning must be measured are typical community based environments, not environments that are isolated or segregated by ability. Typical community environments include homes, neighborhoods, schools, businesses, and other environments in which people of similar age ordinarily live, play, work and interact. The concept of age peers should also include people of the same cultural or linguistic background.

. . . .

Assumption 3: "Within an individual, limitations often coexist with strengths." This means that people with mental retardation are complex human beings who likely have certain gifts as well as limitations. Like all people, they often do some things better than other things. Individuals may have capabilities and strengths that are independent of their mental retardation. These may include strengths in social or physical capabilities, strengths in adaptive skill areas, or strengths is one aspect of an adaptive skill in which they otherwise show an overall limitation.[11]

. . . .

Assumption 5: "With appropriate personalized supports over a sustained period, the life functioning of the person with mental retardation will generally improve." This means that if appropriate personalized supports are provided to an individual with mental retardation, functioning will improve. . . . The important point is that the old stereotype that people with mental retardation never improve is incorrect. Improvement in functioning should be expected from appropriate supports, except in rare cases.

AAMR at pp. 8-9 (2002 ed).

The AAMR addressed the issue of why a deficit in only one area,

---

[11] Toblowsky notes that in "a more general sense, this definitional approach is also consistent with one of the key assumptions to be utilized in the application of the AAMR's mental retardation definition, i.e. that limitations often coexist with strengths within an individual. **Therefore, the presence of a strength in a particular area does not negate the coexistence of a limitation in another area of sufficient significance to establish the adaptive behavior component of the mental retardation definition.** (emphasis added). Tobolowsky at p. 97

9

conceptual, social and practical skills, was necessary for a mental retardation

diagnosis.

> Second, the probability of a person having significant deficits (2 SDs below
> the mean) in two or in all three domains of adaptive behavior is extremely
> low compared to the probability of scoring two standard deviations or below
> on only one domain. In fact, simulations studies have demonstrated that the
> probability of a person scoring two standard deviations below the mean on
> more than one domain would be so low that almost no one with an IQ in the
> upper mental retardation range would be identified as having mental
> retardation (citation omitted).

Id at 78.

Finally, there is the definition of clinical judgment. In most forensic

psychological settings, the requisite degree and some experience is all that is

required. In the field of mental retardation, however, the concept of clinical

judgment has a far different and much more specialized meaning:

> Clinical judgment is a special type of judgment rooted in a high level of
> expertise and experience; it emerges directly from extensive data. It is based
> on the clinician's explicit training, **direct experience with people who have
> mental retardation**, and familiarity with the person and the person's
> environments. Thus, clinicians who have not gathered extensive relevant
> assessment data should not claim clinical judgment. Clinical judgment
> should *not* be thought of as a justification for abbreviated evaluations, a
> vehicle for stereotypes or prejudices, a susbstitute for insufficiently explored
> questions, an excuse for incomplete or missing data, or a way to solve
> political problems. **Rather, it should be viewed as a tool of clinicians with
> training and expertise in mental retardation and ongoing experience
> with - and observations of - people with mental retardation and their
> families.**

Id at 95, (emphasis added).

Against these scientific standards, it is easy to understand why the government's case against mental retardation, and the opinions of both the District Court and the panel of this Court, fail.

First it is clear that neither of the Government's experts met the AAMR standards for the exercise of clinical judgment. Dr. Parker's experience with the mentally retarded last occurred in 1959 while he was working in a state hospital program. He claimed to have made one diagnosis of retardation in the forensic setting but could remember no details of it. ( R. Vol. 26, P. 70-71) He was unaware that his testing procedure was condemned by the Weschler manual until he was made aware of it on cross examination. Id at 76-7. [12] Again from Tobolowsky: "The assessment of intellectual functioning is a task that requires specialized professional training. Assessment data should be reported by an examiner(s) experienced with people who have mental retardation and qualified in terms of

---

[12]. Dr. George Denkowski, unlike either of the government experts, was certified to render diagnostic opinions on mentally retarded people for the Texas Department of Mental Health and Mental Retardation. He testified that all eleven parts of the WAIS had to be given if the test was to be used for diagnostic purposes, and even if it is to be used for non-diagnostic reasons, one still had to administer a minimum of nine subtests. The government's expert, Dr. Parker, gave only seven – or 65% – of the complete test. (R.26:201-204). Dr. Denkowski testified that there was no authority for administering less than the full test or for excluding difficult subtests while including only the easier subtests, as Dr. Parker did. (R.26:204-206). Consequently, Dr. Parker's results were substantially inflated. Id.

11

professional and state regulations as well as **meeting a publisher's guidelines for conducting a thorough, valid psychological evaluation of the individual's intellectual functioning.** Tobolowsky at p. 95. see also pp.101-02. Dr. Coon's "expertise" was even more lacking than Dr. Parker's. He never performed IQ testing, never used scalable instruments and had no familiarity with the AAMR manual. It is clear then, that both the District Court and the panel opinion erred in relying on the testimony of two "experts" who did not meet the definitional requirement of the AAMR. Their opinions simply have no weight here.

Further, the opinions of both the District Court and the panel opinion relied on a fundamental misperception of mental retardation by assessing an individuals' strengths. Such an approach would result in almost no one in the mild mental retardation range ever being found mentally retarded. It ignores the assumption of mental retardation: those who are retarded possess strengths, even gifts, as well as their weaknesses. It is their weaknesses that support the claim of mental retardation.

A prison or jail setting is hardly the ideal support system for the mentally retarded, but in many ways, it serves the same functions. The inmates' range of decision making is necessarily limited. In such a structured environment, he is very likely to improve in functioning. This does not mean that he is not retarded;

12

only that his functioning has improved. The retarded can read but not, as Webster, understand. They can learn to request items from the commissary and learn to count change. They can scheme to gratify sexual impulses. It does not mean that they are not retarded. Only the community in which such individuals normally live may serve as the standard.[13]

Defense expert, Dr. Keyes, agreed that Webster was "capable of appearing to be a, quote, normal individual, " (R. Vol. 24, p. 27) and that "Bruce has certain skills that were not expected........." (R. Vol. 24, P. 29).  But he also noted a number of deficits: (1) "[N]ot capable of carrying on a high level of conversation"; (**Conceptual domain**) (2) "[S]it down and read a text and understand everything he reads"; (**Conceptual domain**) (3) [U]nable to to do a job for extended periods of time without goofing off because his ability to concentrate would sway." (**Practical domain**) (R. Vol 24, P. 107) (4) on working at McDonalds, Keyes replied: "In a very low level job. I wouldn't think he would be a good person to have around the fryer for obvious reasons, *safety* reasons.  (**Practical domain**)  (5) Keyes also

---

[13] The panel opinion also relied heavily on the facts of the crime, but even crime facts that reflect adaptive strengths do not negate coexisting significant adaptive limitations. This is not a balancing test where strengths are measured against deficits; it is only required that significant adaptive deficits be established. Tobolowsky at p. 98-9.  A number of courts have expressed reservations about using crime facts to resolve the issue of mental retardation under *Atkins. Zant v Foster*, 406 S.E.2d 74, 76 (Ga. 1991); *Lambert v. State,* 71 P.3d 30, 31 (Okla.Crim.App. 2003); *State v Patillo*, 417 S.E.2d 139, 140-41 (Ga. 1992).

13

thought Webster might have difficulty making change. "[I]f somebody gives him $20 for a $16.52 bill, he might have difficulty coming up with the $3.48. (**Practical domain**) (R. Vol. 24, P. 107, 108) (6) Keyes also stated that Webster "[I]s unable to see the consequences of his actions appropriately;" (**Social domain**) (7) "He is unable to plan situations appropriately;" (**Social domain**) (8) "He is unable to think in abstract methods....;" (**Conceptual domain**) (9) "He is unable to *communicate* appropriately under several circumstances;" (**Conceptual domain**) (10) "He has very poor short term memory and an only reasonably okay long term memory." (**Conceptual domain**) (R. Vol. 24, P. 48) (11) Webster had never lived on his own. (**Practical domain**) (12) Webster had never had a bank account or a charge card. (**Practical domain**) (R. Vol. 24, P. 44)(Emphasis added)

## CONCLUSION

Webster is mentally retarded. He has demonstrated significant cognitive impairment, deficits in adaptive functioning, and that his disability manifested itself well before his eighteenth birthday, all established well before trial. Webster's execution is therefore barred by the Eighth Amendment and by 18 U.S.C. 3596. Webster is entitled to relief.

**PHILIP WISCHKAEMPER**

14

## CERTIFICATE OF SERVICE

This is to certify that a copy of this motion for rehearing en banc was served

on opposing counsel by mailing same on October 21, 2005.

Philip Wischkaemper

United States Court of Appeals
Fifth Circuit

**F I L E D**

**August 11, 2005**

Charles R. Fulbruge III
Clerk

In the
### United States Court of Appeals
### for the Fifth Circuit

---

Nº 03-11194

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

BRUCE CARNEIL WEBSTER,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Northern District of Texas

---

Before SMITH, WIENER, and BARKSDALE,
    Circuit Judges.

JERRY E. SMITH, Circuit Judge:

Bruce Webster, a federal prisoner under a sentence of death, appeals the denial of his petition for post-conviction relief under 28 U.S.C. § 2255 on two related claims that the district court rejected on the merits but on which it granted a certificate of appealability ("COA"). Concluding that Webster is not entitled to relief, we affirm.

I.

A.

In 1996, a federal jury convicted Webster of three offenses—kidnaping resulting in death, conspiring to kidnap, and using and carrying a firearm during a crime of violence—for his role in the shocking and exceedingly brutal kidnaping, rape, and murder of sixteen-year-old Lisa Rene.[1] The

---

[1] The facts are set forth in chilling detail in *United States v. Webster*, 162 F.3d 308, 317-19 (5th Cir. 1998).

government sought a death sentence pursuant to the Federal Death Penalty Act of 1994, 18 U.S.C. §§ 3591-3598, and after a separate sentencing hearing the jury returned special findings that Webster satisfied the requisite elements of intent, *see* § 3591(a), and that three statutory and two non-statutory aggravating factors existed, *see* § 3592.[2] Varying numbers of jurors found nine mitigating factors.[3] By unanimous vote as required, the jury recommended that Webster be sentenced to death.

After imposing a death sentence on the verdict, the district court entered a finding that Webster is not mentally retarded and is therefore not exempt from the death penalty under 18 U.S.C. § 3596(c),[4] which prohibits the imposition of a death sentence on a person who is mentally retarded or, because of a mental disability, lacks the mental capacity to understand the death penalty or why it was imposed.

Webster maintained during the penalty

---

[2] *See id.* at 319 n.1 (identifying aggravating factors unanimously found by the jury).

[3] *See id.* at 319-20 n.2 (identifying statutory and non-statutory mitigating factors presented by Webster and the number of jurors, if any, that found each factor).

[4] The finding provides:

After consideration of all the evidence and information presented in the guilt and punishment phases of trial, the Court hereby issues its factual finding that the defendant Webster is not mentally retarded and that he possesses the requisite mental capacity to understand the death penalty and why it will be imposed on him. As a result, the defendant Webster is not exempt under 18 U.S.C. § 3596(c) from implementation of the death penalty.

phase that he is mentally retarded and, in support, presented testimony from four medical experts regarding his mental capacity and the testimony of a fifth medical expert on surrebuttal to critique the methodology used by one of the government's experts in testing his cognitive abilities.[5] Webster presented voluminous evidence of the abuse he suffered as a child, including testimony from his mother, two of his brothers, two of his sisters, an aunt, a niece, and an ex-girlfriend. All these witnesses testified about the severe physical and sexual abuse Webster's father inflicted on his children and his wife (Webster's mother).

The government vigorously disputed Webster's claim of mental retardation. Beyond cross-examining defense experts, the government produced two medical experts who testified that they did not believe Webster was retarded and, moreover, that the methodology used by defense experts to gauge his mental capacity was critically flawed and misleading. The government presented numerous other witnesses, including correctional and probation officers, former teachers, and fellow inmates, whose testimony contradicted Webster's claim of retardation.

## B.

We affirmed the conviction and sentence on direct appeal, *see United States v. Webster*, 162 F.3d 308 (5th Cir. 1998), *cert. denied*, 528 U.S. 829 (1999). Among the more than twenty claims Webster raised on direct appeal,

---

[5] *See Webster*, 392 F.3d 787, 793-94 & n.10 (5th Cir. 2004) (summarizing Webster's expert testimony and denying a COA, as discussed *infra*); *Webster v. United States*, No. 4:00-CV-1646-Y, 2003 WL 23109787, at *6-7, 12-14 (N.D. Tex. Sept. 30, 2003) (reviewing defense expert testimony on mental retardation).

we rejected his claim that the district court's finding that he is not mentally retarded, to which no objection was made at trial, was against the greater weight and credibility of the evidence. *See id.* at 352-53. Reviewing for clear error, we determined that "[t]he government presented substantial evidence to support the finding," *id.* at 353, and accordingly we rejected the claim.

Webster thereafter filed, in 2000, a motion to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255, and an amended § 2255 motion challenging his conviction and sentence on sixteen grounds in 2002. The district court rejected Webster's claims and dismissed his motion, *see Webster v. United States*, No. 4:00-CV-1646-Y, 2003 WL 23109787 (N.D. Tex. Sept. 30, 2003).

Webster applied for a COA on each of the sixteen grounds raised in his amended § 2255 motion.[6] The district court granted a COA limited to two of the sixteen claims: first, that the evidence presented at trial was insufficient to warrant the district court's finding that Webster is not mentally retarded; and second, that his alleged retardation renders him ineligible for a death sentence.

Webster then applied to this court for a COA on the fourteen issues deemed unworthy of collateral appellate review by the district court; we denied a COA on each of the additional claims, *see United States v. Webster*, 392 F.3d 787 (5th Cir. 2004). We now address, on the merits, Webster's appeal on the

two issues rejected on the merits but on which the district court granted a COA.

## II.

### A.

Webster contends that the evidence presented at trial was insufficient to warrant the district court's finding that he is not mentally retarded. The government argued to the district court that this claim is procedurally barred because it was raised and rejected on direct appeal,[7] but the district court appears to have concluded that, though on direct appeal we rejected Webster's claim that the finding was against the greater weight and credibility of the evidence, the intervening decision in *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that the Eighth Amendment prohibits execution of the mentally retarded) saves this claim from a procedural bar. *See Webster*, 2003 WL 23109787, at *5.

Yet, even before *Atkins*, at the time of Webster's trial, 18 U.S.C. § 3596(c) prohibited the execution of mentally retarded offenders in federal prosecutions. The only substantive change (as explained further *infra*) ushered in by *Atkins* with respect to federal capital defendants, then, is the recognition of a new source of federal law (*i.e.*, constitutional) that bars their execution. In any event, we assume for present purposes that *Atkins* permits, whether by way of clarification of the meaning of mental retardation or some other reason, Webster to restate his sufficiency challenge, so we proceed to address the merits, but we do

---

[6] *See* 28 U.S.C. § 2253(C)(1)(B) ("Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from . . . the final order in a proceeding under section 2255.").

[7] *See United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986) ("It is settled in this Circuit that issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in § 2255 motions."); *United States v. Rochas*, 109 F.3d 225, 229-30 (5th Cir. 1997).

so without deciding that we must.

### B.

In advancing his collateral challenge to the sufficiency of the evidence, Webster invokes *Jackson v. Virginia*, 443 U.S. 307 (1979), which held that a state defendant is entitled to federal habeas corpus relief if the state's evidence was such that no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Webster argues that *Jackson* provides the standard against which the evidence supporting the finding that he is not mentally retarded should be measured—the necessary implication being that the government had the burden of proving beyond a reasonable doubt that Webster is *not* mentally retarded.

But the *Jackson* standard is inapposite here, where the challenged finding is the *absence* of mental retardation, and not a substantive element of the offense to which *Jackson* applies by its own terms,[8] or an aggravating circumstance, sentencing factor, or special issue in the context of capital proceedings, to which *Jackson* has since been applied.[9]

---

[8] *See Jackson*, 443 U.S. at 319 ("[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found *the essential elements of the crime* beyond a reasonable doubt.") (second emphasis added).

[9] *See, e.g., Lewis v. Jeffers*, 497 U.S. 764, 781 (1990) (holding that in reviewing whether a state court's finding of an aggravating factor is so erroneous as to constitute an Eighth Amendment or due process violation, a federal court considering a habeas corpus petition should apply the "rational factfinder" test established in *Jackson*); *Martinez v. Johnson*, 255 F.3d 229, 244-45 (5th Cir. 2001) (continued...)

Moreover, nothing in the Federal Death Penalty Act requires the government to prove—by any standard, much less beyond a reasonable doubt—that a capital defendant is not mentally retarded. Nor does anything in *Atkins* require, as a constitutional matter, the government to prove—again, by any standard, much less beyond a reasonable doubt—that a capital defendant is not mentally retarded. Instead, the Court in *Atkins* decided to "leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Atkins*, 536 U.S. at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 416-17 (1986) (alterations in original)). And several states have since placed the burden on capital defendants to prove by a preponderance of the evidence that they are mentally retarded.[10]

In fact, even before the district court looked askance at Webster's suggestion on collateral review that the government had to prove his non-retardation beyond a reasonable doubt, we had already rejected the claim, albeit in the context of a state prisoner on federal habeas review, that *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584

---

[9](...continued)
(applying *Jackson* to sufficiency challenge to future dangerousness finding); *Fierro v. Lynaugh*, 879 F.2d 1276, 1280 (5th Cir. 1989) (same); *Green v. Johnson*, 160 F.3d 1029, 1046-47 (5th Cir. 1998) (applying *Jackson* to a challenge to the sufficiency of a finding of deliberateness); *Callins v. Collins*, 998 F.2d 269, 276 (5th Cir. 1993) (same).

[10] *See, e.g., Ex Parte Briseno*, 135 S.W. 3d 1, 12 (Tex. Crim. App. 2004); *Russell v. State*, 849 So. 2d 95, 148 (Miss. 2003); *State v. Williams*, 831 So. 2d 835, 860-61 (La. 2002); *Murphy v. State*, 54 P.3d 556, 568 (Okla. Crim. App. 2002).

4

(2002), when read together with *Atkins*, require the government to prove beyond a reasonable doubt that a capital defendant is not mentally retarded. In *In re Johnson*, 334 F.3d 403, 405 (5th Cir. 2003), we squarely held that "neither *Apprendi* and *Ring* nor *Atkins* renders the absence of mental retardation the functional equivalent of an element of capital murder which the state must prove beyond a reasonable doubt."[11]

Indeed, it was on this basis that we denied Webster a COA on his claim that *Apprendi* and *Ring* alone require the government to prove his non-retardation beyond a reasonable doubt. *See Webster*, 392 F.3d at 791-92.[12]

---

[11] *See also Ring*, 536 U.S. at 609 (noting that jury finding beyond a reasonable doubt is constitutionally required for aggravating factors that operate as "the functional equivalent of an element of a greater offense"); *Walker v. True*, 399 F.3d 315, 326 (4th Cir. 2005) (rejecting claim that *Ring* requires a jury determination of mental retardation, and reasoning that "an increase in a defendant's sentence is not predicated on the outcome of the mental retardation determination; only a decrease") (internal marks omitted); *Johnson*, 334 F. 3d at 405 ("[T]he absence of mental retardation is not an element of the sentence any more than sanity is an element of an offense."); *cf. Medina v. California*, 505 U.S. 437, 449 (1992) (holding that a state may presume a defendant to be competent and require him to carry the burden of proving his incompetence by a preponderance of the evidence).

[12] Even if the rules announced in *Apprendi* and *Ring* were applicable to the absence of mental retardation, the bar of non-retroactivity would preclude their application to cases already final on direct review. *See Webster*, 392 F.3d at 792; *see also Schriro v. Summerlin*, 542 U.S. 348, ___, 124 S. Ct. 2519, 2526 (2004) (holding that the pro-
(continued...)

Accordingly, we reject Webster's claim to the extent it is based on an alleged constitutional error in the allocation of the burden of persuasion and standard of proof.

## C.

In any event, the district court proceeded dutifully to re-examine the extensive record evidence bearing on Webster's mental capacity and concluded, once again, that a "rational fact-finder could have found that Webster is not mentally retarded based on the evidence presented at trial." *Webster*, 2003 WL 23109787, at *11. Once again, we cannot say the district court erred in reaching this conclusion and rejecting Webster's renewed sufficiency challenge. *See Webster*, 192 F.3d at 352-53.

To be sure, as the district court noted, "all of the experts who testified at Webster's trial, including those who testified for the government, acknowledged that Webster has a low I.Q." *Id.* at *14.[13] But, under the definition of

---

[12](...continued)
cedural rule announced in *Ring* is not retroactive to cases already final on direct review); *United States v. Brown*, 305 F.3d 304, 310 (5th Cir. 2002) (holding that the procedural rule announced in *Apprendi* is not retroactively applicable to initial post-conviction petitions under § 2255).

[13] There was a dispute as to how low, and both government experts, Dr. George Parker and Dr. Richard Coons, testified that, in their opinion, Webster had an incentive not to perform well on cognitive tests administered after he was charged in this case; they pointed to earlier tests taken by Webster on which he scored higher. Parker also testified that lifestyle choices and cultural factors can account for low I.Q. scores (a point defense experts Dr. Keyes and Dr. Finn acknowledged), thus casting doubt on the reliability of the I.Q.
(continued...)

mental retardation cited in *Atkins, see* 536 U.S. at 308 n.3, a showing of borderline or below average intelligence does not alone constitute an adequate showing of retardation. Rather, an adequate showing of mental retardation also requires significant deficits in adaptive skills,[14] and it is here, as the district court concluded, that the government effectively countered Webster's claimed retardation:

> [T]he issue of adaptive skills or the lack thereof is where the parties converged at Webster's trial. While the defense did place into evidence the results of the Vineland test, government witnesses effectively reputed some of those findings with direct evidence that Webster has adapted to his environment and does possess skills that his family stated he did not. Looking at all the evidence presented by both sides at trial, while it is undisputed that Webster has had low I.Q. scores on almost every I.Q. test that has been administered to him, these scores are, according to even defense

witness Dr. Keyes, attributable to "non-organic" factors, which this Court understands to mean his lack of quality formal education and any positive or productive home life. Nevertheless, the evidence presented at trial does reflect that Webster has adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the "home" he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math. This evidence therefore supports a finding that Webster does not have a deficit in adaptive skills.

*Webster*, 2003 WL 23109787, at *14.[15]

---

[13](...continued) tests administered by Keyes, which required Webster to define words (he was unable to define "inflation") and recognize faces (he could not identify Shakespeare, Mark Twain, or Albert Einstein from pictures) to which he was unlikely to have been previously exposed.

[14] Mental retardation has as its essential feature significantly subaverage general intellectual functioning accompanied by significant limitations in adaptive functioning, with onset before the age of eighteen. *Morris v. Dretke*, 413 F.3d 484, ___, 2005 U.S. App. LEXIS 11430, at *4 (5th Cir. June 16, 2005) (quoting AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 41 (text rev. 4th ed. 2000)).

---

[15] In fact, not only were government experts able to refute many of the specific findings obtained from the "Vineland test" administered by Keyes, *see Webster*, 2003 WL 23109787, at *13, but they testified that the test was an inappropriate and deceptive measure of Webster's adaptive skills, given his lifestyle as a drug dealer. Moreover, government experts noted that Webster had shown cleverness and adaptability when he sneaked into the women's portion of the jail in which he was held, concocted cover stories and made excuses to police when he was arrested with a key in his pocket to the motel room in which Lisa Rene was held and raped repeatedly, and burned his clothes to destroy evidence after her murder.

The government also presented the testimony of numerous other witnesses, including correctional officers and fellow inmates that, while incarcerated, Webster engaged in various activities potentially inconsistent with a finding of retardation. For example, he wrote letters to fellow inmates; received letters and newspapers; read aloud (continued...)

6

### III.

Webster claims he is mentally retarded and thus ineligible for his death sentence, but given our rejection of his claim regarding the standard of proof and sufficiency of the evidence supporting the contrary finding at trial, this claim is reduced, in essence, to nothing more than an attempt to re-litigate the question. Indeed, Webster's brief does not point to any new evidence bearing directly on his mental capacity; instead, it summarizes the evidence presented at trial concerning his cognitive abilities and childhood experiences.[16]

---

[15](...continued)
from newspapers; wrote request slips for various services; prepared written grievances; submitted names and addresses of people for his visitation list; and on one occasion complained because the change he received from the prison commissary was incorrect.

[16] Webster's brief does refer to evidence marshaled in the district court on collateral review concerning racial discrimination in the district where Webster attended school, which Webster continues to assert would have, if presented at trial, demonstrated why he was not enrolled in special education courses and therefore would have effectively countered the government's assertion that he is not mentally retarded. But we previously denied Webster a COA on an ineffective assistance of counsel claim premised on the failure of defense counsel to investigate and present such evidence and on a a vague yet related claim under *Brady v. Maryland*, 373 U.S. 83 (1963), *see Webster*, 392 F.3d at 795, 797-99.

Our analysis of those claims obtains equally here: "In the main, the prosecution presented substantial evidence countering Webster's claim of mental retardation, and the government's effort did not depend in any significant respect on Webster's non-enrollment in special education courses." *Id.* at 798-99. Thus, we held that even if
(continued...)

Webster cannot, however, continue to litigate this claim hoping that some court eventually will agree with him. The question whether he is mentally retarded was, as the district court observed, "a highly contested one at trial," *Webster*, 2003 WL 23109787, at *12, and Webster failed to convince *either* the district court that he is retarded or, moreover, a majority of the jurors that he is or even *may be* retarded. And the record supports those findings.

The judgment denying Webster's petition for post-conviction relief is AFFIRMED.

---

[16](...continued)
Webster could otherwise sustain his claims, "the incremental impeachment value, if any, of such evidence does not raise a possibility that, had the evidence been presented, the outcome would have been different." *Id.* at 795; *see also id.* at 799.