# 03-11194

U.S. COURT OF APPEALS

FILED

DEC 2 1 2005

CHARLES R. FULBRUGE III
CLERK

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH JUDICIAL CIRCUIT

### UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

### BRUCE CARNEIL WEBSTER,

Defendant-Appellant.

On Appeal from the United States District Court
for the Northern District of Texas
Fort Worth Division
District Court Numbers 4:94-CR-121-Y and 4:00-CV-1646-Y

### GOVERNMENT'S RESPONSE TO WEBSTER'S PETITION
### FOR REHEARING *EN BANC*

As ordered, the United States of America, by and through the United States

Attorney for the Northern District of Texas, files this response to the petition for

rehearing *en banc* filed by Bruce Carneil Webster, appellant, in the above-

captioned appeal. The government asks that this Court deny such petition because

it is without merit. The record clearly supports the panel's affirmation and the

district court's determination.

I.

On June 7, 1996, Webster was convicted in the United States District Court for the Northern District of Texas of three offenses related to the kidnapping and murder of Lisa Rene: (1) kidnapping resulting in the death of Lisa Rene (count one); (2) conspiring to commit kidnapping (count two); and (3) using and carrying a firearm during a crime of violence (count six). Upon the jury's recommendation, he was sentenced to death on count one. The district court imposed a life sentence on count two, and 60 months imprisonment on count six, to run consecutively. Webster's convictions and sentence were affirmed by this Court on December 3, 1998. *United States v. Webster*, 162 F.3d 308, 317 (5th Cir. 1998). His petition for writ of *certiorari* was denied by the United States Supreme Court on October 4, 1999. *Webster v. United States*, 528 U.S. 829 (1999).

He subsequently filed a timely petition for post-conviction relief under 28 U.S.C. § 2255, which was denied and dismissed on September 30, 2003. Webster appealed from such denial and dismissal. The district court granted a Certificate of Appealability (COA) as to two issues: (1) Webster's claim that he is ineligible for the death penalty because he is mentally retarded, and (2) his contention that the evidence at trial was insufficient to support the court's finding that he is not mentally retarded. Webster filed an application for additional COA issues, and

brief in support thereof, with this Court, which was denied on December 7, 2004. *United States v. Webster*, 392 F.3d 787 (5th Cir. 2004). On August 11, 2005, this Court affirmed the district court's denial and dismissal of Webster's post-conviction writ. *United States v. Webster*, 421 F.3d 308 (5th Cir. 2005).

## II.

In his petition for rehearing *en banc*, Webster contends that he is, contrary to the panel opinion and the district court's determination, mentally retarded. He argues that the panel reached a wrong result because it defined mental retardation "not on the basis of the clinical definition but in such a fashion that plays more into misconceptions about mental retardation than what is demanded by science." Petition, p. ii. He also contends that the panel opinion is at odds with the Supreme Court's opinion in *Atkins v. Virginia*, 536 U.S. 304 (2002). He further argues that

> [i]n short, both the District Court and the panel concluded that Webster was not retarded because his alleged disability did not affect every aspect of his life; there were things he could do and this ability placed him above the level of retardation. None of this has anything to do with the clinical definition of mental retardation, a definition which includes not just standards for the patient but for those who assess the level of disability as well.

Petition, p. 6.

Contrary to Webster's assertions, the district court determined that Webster failed to establish that he is mentally retarded because the independent evidence of

his proven adaptation was at odds with his experts' analysis of his adaptive skills.
(R3/634.) Although Webster tries to shift the focus from his failure to prove
mental retardation to an attack on the definition of mental retardation used by the
district court and the "adequacy" of the government experts, neither the district
court's determination nor the panel's affirmation are at odds with *Atkins*.

### III.

Although noting that the American Association of Mental Retardation
(AAMR) and the American Psychiatric Association define mental retardation
similarly, *Atkins*, 536 U.S. at 308 n.3, 122 S. Ct. at 2245 n.3, the *Atkins* decision
mandates neither a definition nor a standard for the determination of mental
retardation.[1] The Supreme Court explained that, "[t]o the extent there is serious

---

[1] "The American Association on Mental Retardation (AAMR) defines mental retardation
as follows: 'Mental retardation refers to substantial limitations in present functioning. It is
characterized by significantly subaverage intellectual functioning, existing concurrently with
related limitations in two or more of the following applicable adaptive skill areas:
communication, self-care, home living, social skills, community use, self-direction, health and
safety, functional academics, leisure, and work. Mental retardation manifests before age 18.'
Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992). The
American Psychiatric Association's definition is similar: 'The essential feature of Mental
Retardation is significantly subaverage general intellectual functioning (Criterion A) that is
accompanied by significant limitations in adaptive functioning in at least two of the following
skill areas: communication, self-care, home living, social/interpersonal skills, use of community
resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion
B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many
different etiologies and may be seen as a final common pathway of various pathological
processes that affect the functioning of the central nervous system.' Diagnostic and Statistical
Manual of Mental Disorders 41 (4th ed.2000)." *Atkins*, 536 U.S. at 308 n.3, 122 S. Ct. at 2245
n.3.

disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded," and that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Atkins*, 536 U.S. at 317, 122 S. Ct. at 2250. The *Atkins* Court made clear that each state would have to determine for itself the protocol for such a determination: "As was our approach in *Ford v. Wainwright*, 477 U.S. 399, 106 S. Ct. 2595, 91 L.Ed.2d 335 (1986), with regard to insanity, 'we leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences.'" *Atkins*, 536 U.S. at 317, 122 S. Ct. at 2250.

The district court here was familiar with the definitions of mental retardation propounded by AAMR and the American Psychiatric Association – significant limitation in intellectual functioning, significant limitation in adaptive behavior and functioning, and onset of these limitations before the age of 18 – but, concluded, based on the evidence presented at trial, that Webster had failed to show that he is mentally retarded because his evidence was inadequate. The fact that Webster scored low on several I.Q. tests is alone insufficient to prove mental

retardation.[2] *See, e.g., Jones v. Johnson*, 171 F.3d 270, 276 (5th Cir. 1999) ("a showing of borderline or below average intelligence does not constitute a showing of mental retardation.").[3] Webster may be a person with low intellectual functioning, but a diagnosis of mental retardation also requires significant deficits in adaptive skills. (R47/9.) *See Webster*, 421 F.3d at 313 ("under the definition of mental retardation cited in *Atkins*, ..., a showing of borderline or below average intelligence does not alone constitute an adequate showing of retardation. Rather, an adequate showing mental retardation also requires significant deficits in adaptive skills.") The record clearly supports the court's conclusion that Webster failed to show the requisite lack of adaptive skills.[4]

---

[2] The government submits that Webster scores poorly on I.Q. tests when he has no incentive to make a higher score. When Webster has no disincentive to score higher, he is capable of doing so. (R29/51-3, 60-1, 63, 67, 126, 142.) There was other evidence showing that Webster functions much higher than his I.Q. scores would indicate. For example, a highway patrolman with the Arkansas State Police testified that, on June 15, 1992, Webster scored 96 percent on the multiple choice portion of his driver's license examination and 70 percent on the signs portion of the exam. The officer testified that there were three versions of the test and that the version that is actually given is selected at the time the person takes the test. In order to cheat by receiving the answers to the test beforehand, a person would have to memorize 75 multiple choice questions and 30 road signs. (R50/225-232; GE 95.)

[3] Contrary to Webster's assertion, the panel opinion did not say that all of the experts found that Webster's IQ was very, very low – which in fact it was not – instead the Court reiterated the district court's note that "all of the experts who testified at Webster's trial, including those who testified for the government, acknowledged that Webster has a low I.Q." *Webster*, 421 F.3d at 312-313.

[4] "Impairments in adaptive functioning, rather than a low IQ, are usually the presenting symptoms in individuals with Mental Retardation. *Adaptive functioning* refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, socioeconomic background, and community setting. Adaptive functioning may be influenced by various factors, including education,

In denying relief to Webster, the district court exhaustively set out the evidence it considered on this highly contested issue:

> Webster called four expert witnesses who testified about his mental capacity, including Dr. Raymond Finn, Dr. Denis Keyes, Dr. Robert Fulbright, and Dr. Mark Cunningham. Webster was given different I.Q. tests by some of these experts, and he scored between a composite score of between a 51 and a 65. (R. 23:184-94; R. 24:20). Webster's experts agreed that an I.Q. score of around 70 or lower, along with a lack of adaptive skills and the onset of these deficits before the age of 18, are the criteria for a diagnosis of mental retardation. (R. 23:183, 229-30). [Footnote omitted.] In order to assess Webster's adaptive skills, Dr. Keyes used the Vineland test, which involved asking numerous questions of people who knew Webster before he was eighteen, including family members, teachers, and friends, but dropping those answers that are inconsistent with the answers of most of the interviewees. (R. 24:36-42). From this, Keyes determined that Webster lived at home, did not have a bank account or a charge card, and was never observed setting the dinner table,

---

motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation. Problems in adaptation are more likely to improve with remedial efforts than is the cognitive IQ, which tends to remain a ore stable attribute.

It is useful to gather evidence for deficits in adaptive functioning from one or more reliable independent sources (e.g., teacher evaluation and educational, developmental, and medical history). Several scales have also been designed to measure adaptive functioning or behavior (e.g., the Vineland Adaptive Behavior Scales and the American Association on Mental Retardation Adaptive Behavior Scale). These scales generally provide a clinical cutoff score that is a composite of performance in a number of adaptive skill domains. It should be noted that scores for certain individual domains are not included in some of these instruments and that individual domain scores may vary considerably in reliability. As in the assessment of intellectual functioning, consideration should be given to the suitability of the instrument to the person's sociocultural background, education, associated handicaps, motivation, and cooperation. For instance, the presence of significant handicaps invalidates many adaptive scale norms. In addition, behaviors that would normally be considered maladaptive (e.g., dependency, passivity) may be evidence of good adaptation in the context of a particular individual's life (e.g., in some institutional settings)." Diagnostic and Statistical Manual of Mental Disorders 40 (4th ed. 2000) (emphasis in the original).

assisting in the preparation of meals, or making his bed. He also determined that no one had known Webster to keep secrets or confidences or address envelopes on his own. (R. 24:44-5, 73-6). Dr. Keyes testified that he did not speak to Webster's fellow gang members or police officers who had dealt with him before he was eighteen-years-old in reaching his results on the Vineland test. (R. 24:82-4). Based on this test, Dr. Keyes opined that Webster did have a lack of adaptive skills. Based on the I.Q. scores, along with this adaptive skills test and evidence from family members that Webster had been "slow" as a child, all of Webster's experts diagnosed him as being mentally retarded. (R. 24:43, 47, 144, 189). Both Dr. Finn and Dr. Keyes acknowledged that cultural factors can have an effect on I. Q. scores. (R. 23:212; R. 24:59), and Dr. Keyes testified that the I.Q. tests required Webster to define words and recognize faces, and he did not know the definition of "inflation," nor did he recognize pictures of Shakespeare, Mark Twain, or Einstein, but he did recognize Elvis Presley and Stevie Wonder. (R. 24:60-2). Dr. Keyes also testified that Webster had reading and writing abilities that were unusual in a person with his alleged level of retardation and that Keyes attributes this to his belief that Webster probably suffers from "inorganic," as opposed to "organic" retardation. (R. 24:48, 111). Dr. Keyes also acknowledged, upon being questioned by this Court, that evidence that Webster was a leader in the kidnaping plot would be inconsistent with a diagnosis of mental retardation and that, in his opinion, it would have been "unlikely" that Webster was the one who physically took the victim. (R. 24:102).

The government, on the other hand, offered testimony from two experts, Dr. George Parker and Dr. Richard Coons. Dr. Parker testified that he administered an I.Q. test to Webster and his composite score was a 72. (R. 26:49). Dr. Parker and Dr. Coons testified that they did not believe that Webster is mentally retarded. (R. 26:143). Both Parker and Coons believed that Webster was not motivated to do well on I.Q. tests administered after he was charged in this case, and pointed as evidence of this to prior tests where he scored higher, such as tests given to him when he was in junior high, when he was in prison previously, and when he was in the Job Corps.

(R. 26:51-3, 60-1, 63, 67, 126, 142). Parker also observed that the fact that someone like Webster lived in a sub-culture in which he was not exposed to a lot of vocabulary could cause his I.Q. scores to be lower. (R. 26:50-51).

Primarily, however, Parker and Coons questioned the results obtained by the defense when the test was administered to determine Webster's adaptive skills. Parker testified that he did not believe that the Vineland test was appropriate in Webster's case because of Webster's lifestyle, namely that of a drug dealer. Because of choices that Webster had made in his life, and because Webster had been in prison most of the time since he was fifteen years old, Parker and Coons believed that he would rate deceptively poor on the Vineland test. Dr. Parker and Dr. Coons also disputed some of the results Dr. Keyes did obtain with the Vineland test. Specifically, Dr. Keyes had indicated on the test that Webster's family members stated that Webster did not speak in complete sentences, did not read simple stories aloud, and did not read on his own initiative, when both the two experts and officers at the prison where he was housed after being charged in the instant case had observed that Webster did all of these things. Moreover, his family had stated that they did not know whether Webster addressed envelopes, put his clothes away, or made his own bed, whereas Parker had in his possession an envelope Webster had addressed and had observed that Webster put his clothes away and made his bed in his jail cell. (R. 26: 58-9, 136-39). Parker and Coons also noted that Webster had shown cleverness when he sneaked into the women's part of the jail at one point, and he had shown the ability to adapt to the life he had chosen, as well as life in prison. (R. 26:143-44). Furthermore, Webster had shown adaptability by being deceitful to the police by way of cover stories and excuses when he was arrested with a motel key in his pocket, and had the adaptive ability to destroy evidence when he burned his clothes after Lisa Rene's murder. (R. 26:65-6).

Moreover, the government placed into evidence the testimony of Greg Barber, Webster's former parole officer, Gene Stewart, who was the principal at the junior high that Webster attended, and Rick

McLaughlin, the vice-principal at that same school. They all testified that they did not believe that Webster was mentally retarded and that, when they were visited by Dr. Keyes earlier and told him their opinions, he told them that they could not help him because he was trying to keep Webster from being executed, a charge he disputed in his testimony. (R. 25:26-8, 238, 239-40, 247-48, 249). Moreover, E.C. Turner, Pat Drowett, and Linda Monk, a counselor and two teachers from the junior high Webster attended, testified that in their opinion, while Webster was in "basic" classes at school rather than advanced classes and dropped out in the ninth grade, he is not retarded. (R. 25:34-70). Finally, two fellow inmates and several officers from the federal prison where Webster had been housed for some time testified that Webster wrote letters to other inmates, albeit in almost indecipherable slang, received letters and newspapers, read aloud from the newspapers, wrote request slips for various services, wrote written grievances, submitted names and addresses of people for his visitation list, appeared to be reading from law books in the law library and taking notes, and on one occasion complained because the change he had received after purchasing materials from the commissary was incorrect. (R. 25:86-103, 111-18, 122-25, 128-30, 136-38, 141-46; R. 26:24-35).

In summary, all of the experts who testified at Webster's trial, including those who testified for the government, acknowledged that Webster has a low IQ. The experts disagreed about how low, but even a 72 I.Q. falls into the range where one can be diagnosed as mentally retarded, if one also has a deficit in adaptive skills. (R. 26:85-6). And the issue of adaptive skills or the lack thereof is where the parties converged at Webster's trial. While the defense did place into evidence the results of the Vineland test, government witnesses effectively reputed some of those findings with direct evidence that Webster has adapted to his environment and does possess skills that his family stated that he did not. Looking at all of the evidence presented by both sides at trial, while it is undisputed that Webster has had low scores on almost every I.Q. test that has been administered to him, these scores are, according to even defense witness Dr. Keyes, attributable to "nonorganic" factors, which this

Court understands to mean his lack of a quality formal education and any positive or productive home life. Nevertheless, the evidence presented at trial does reflect that Webster has adapted to the criminal life that he chose and has illustrated the ability to communicate with others, care for himself, have social interaction with others, live within the confines of the "home" he has been in since he was sixteen, use community resources within this home, read, write, and perform some rudimentary math. This evidence therefore supports a finding that Webster does not have a deficit in adaptive skills. *See Atkins*, 536 U.S. at 308, n. 3. The evidence at trial therefore supports a finding that Webster is not mentally retarded and therefore is not rendered ineligible for the death penalty under either *Atkins* or 18 U.S.C. § 3596(c).

(R3/628-634.)[5]

In its response to Webster's amended motion, the government pointed to other evidence showing that Webster did not lack adaptive skills. The government presented testimony from John Clay, which focused on a letter written by Webster's own hand that set forth a "plan" for a sexual rendezvous with female inmates. (R48/85-97; GE 121-A.) It is evident from the record that Webster concocted an elaborate scheme to manipulate the detention center's visitation system and sought Clay's assistance. *Id.* The government also proved up an incident where Webster, while he was incarcerated and awaiting trial, escaped from his area of the jail into the women's area of the jail. (R45/175-190, 200-

---

[5] Normally the government would not quote such a long passage but including *in toto* the court's explanation of the facts is the most succinct method to convey the relevant facts.

207.) The testimony showed that Webster waited until all the cells in his area were unlocked between 4:00 and 4:30 a.m. so that another inmate could get ready to go to court. Webster then left his cell, using a wire to unlatch a food chute. Webster squeezed through the food chute, and then made his way into the women's shower area where he was discovered.

Luther Alexander, a detention officer, testified that he saw Webster in the law library of the jail almost everyday that it was available, and he saw Webster reading and taking notes from the law books. (R51/128-129.) Once when Webster made an oral complaint Alexander told him to fill out a complaint slip, but Webster responded that he could not because his attorney had told him not to fill out any more complaint slips. (R51/129-130.) Before that time, Webster had been prolific in his written requests. The government introduced numerous written request forms and complaint forms made by Webster while he was incarcerated in the Mansfield Law Enforcement Center awaiting trial. (R52/23-33; GE 117-B, 117-C, 117-D, 117-E, 117-F, 117-H, 117-J). The defense stipulated that these requests and complaints, and the letters to John Clay and one

of Webster's co-defendants were in Webster's handwriting. (R52/39-41; GE 121-A, 132-A.)[6]

## IV.

As is clear in the district court's recitation of the evidence it considered, the problem for Webster was that his evidence of adaptive deficiencies was suspect, given the independent evidence showing his adaptive skills. His experts' assessment of his adaptive skills did not line up with that evidence. For example, Dr. Parker, a government expert, observed inconsistencies between Webster's behavior and what Dr. Keyes reported on his Vineland.[7] Dr. Keyes marked the Vineland scale "don't know" for the category "speaks in complete sentences," but Dr. Parker observed that Webster spoke in full sentences. (R52/58.) Dr. Keyes scored a "1" for the category "reads simple stories," and a "0" for the category "reads on own initiative." (R52/58.) Dr. Parker observed that Webster could read simple stories and did, in fact, read on his own initiative. (R52/58.) Dr. Keyes also marked "don't know" for the category "addresses envelope," whereas Dr.

---

[6] Furthermore, despite the voluminous evidence produced by Webster and the relaxed standard provided for mitigation findings, Webster was able to convince only four jurors that he is mentally retarded or might be mentally retarded. Obviously, the "might be" language inured to Webster's benefit because a juror could have voted affirmatively for the mitigation factor even if he or she was not completely convinced that Webster was retarded. Webster had a full opportunity to prove to the jury that he is mentally retarded, including the use of several experts. He was unable to do so.

[7] Testimony from other witness and other evidence offered at trial corroborated Dr. Parker's observations.

Parker observed envelopes that were addressed by Webster. (R52/59.) Dr. Keyes scored "0s" for the categories "puts clean clothes away" and "makes own bed," whereas Dr. Parker observed that Webster kept his cell neat and his bed was neatly made. (R52/57-59.)

Neither the panel nor the district court relied on "a fundamental misperception of mental retardation by assessing [Webster's] strengths," Petition, p. 12. The court did not engage in a balancing test. Instead, the evidence recited by the trial court showed that it was not convinced because the defense experts who assessed Webster – regardless of the efficacy of the Vineland test itself – failed to code the test with correct information, which meant that their conclusion of mental retardation was unreliable. The panel's affirmation of the district court's determination was correct and no *en banc* rehearing should be had by this Court.

Respectfully submitted,

RICHARD B. ROPER
United States Attorney
Northern District of Texas

DELONIA A. WATSON
Assistant United States Attorney
Burnett Plaza, Suite 1700
801 Cherry Street, Unit #4
Fort Worth, Texas 76102-6882
817.252.5200 OFFICE
817.978.3094 FAX

## CERTIFICATE OF SERVICE

I hereby certify that, on the 20th day of December, 2005, the original and 20

copies of the Government's Response to Petition for Rehearing *En Banc*, and a

computer diskette containing the response, were sent via Federal Express to the

Clerk of the United States Court of Appeals for the Fifth Circuit, and two copies

of the document and one computer diskette containing same were served via the

United States Postal Service on Mr. Philip Wischkaemper, counsel for Webster,

Snuggs and Wischkaemper, 915 Texas Avenue, Lubbock, Texas 79401.

DELONIA A. WATSON
Assistant United States Attorney

briefs2005\websterresp.wpd